# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**PETER J. RUSTHOVEN**
**T. JOSEPH WENDT**
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**THOMAS W. HILL**
Kegler, Brown, Hill & Ritter
Columbus, Ohio

**RONALD J. WAICUKAUSKI**
Price Waicukauski & Riley, LLC
Indianapolis, Indiana

**FILED**
Mar 06 2012, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

CBR EVENT DECORATORS, INC., )
GREGORY RANKIN, )
ROBERT COCHRANE, and )
JOHN BALES, )
                     )
     Appellants-Defendants, )
                     )
        vs. )     No. 49A02-1010-CT-1117
                     )
TODD M. GATES, )
                     )
     Appellee-Plaintiff. )
                     )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gerald S. Zore, Judge
Cause No. 49D07-0307-CT-1289

**March 6, 2012**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

Robert Cochrane, John Bales, and Gregory Rankin, shareholders of CBR Event Decorators, Inc., appeal the trial court's judgment entered against CBR in favor of Todd M. Gates. The shareholders challenge the trial court's decision to pierce the corporate veil and hold them personally liable for the judgment against CBR. We conclude that in order to pierce the corporate veil there must be a causal connection between misuse of the corporate form and fraud or injustice. Because there is no such causal connection here, we reverse in part and affirm in part.

## Facts and Procedural History

In the early 1990's, Gates began loaning money to MCS Decorators, Inc., an event decorating company owned and operated by his son-in-law at the time, David Marquart. MCS struggled financially, and nearly a decade later, MCS owed Gates approximately $700,000 plus interest. Cognizant of his financial troubles, Marquart requested that his attorney, Daniel Altman, seek investors for MCS. Altman contacted two of his former clients, Bales and Rankin. Bales and Rankin indicated that they would be interested in investing in MCS. Altman also expressed interest in investing in the company.

Bales and Rankin met with Marquart and Altman numerous times to learn more about MCS. Meanwhile, Gates had retained counsel, Jay Kennedy, and initiated a replevin action to foreclose on his security interest in MCS's assets. Altman represented MCS in the action and did not oppose the replevin. One month later, a trial court entered judgment in Gates's favor, which entitled him to immediate possession, use, and disposition of MCS's assets, including the funds in MCS's financial accounts, MCS's

accounts receivable, inventory, and rights under the company's existing customer contracts.

Immediately following the replevin hearing, Altman asked Gates if he would be receptive to a bid for MCS's assets from Altman and two of his clients. Gates indicated that he would be. Altman, Bales, and Rankin met with Gates to discuss their plan to purchase the company's assets. After the meeting, Rankin conducted due diligence on behalf of Altman and Bales. Rankin reviewed MCS's financial statements and investigated files, customer contracts, and the flow of income and expenses. Rankin discussed the business at length with Marquart and MCS employees.

One month later, Rankin sent Gates an offer to purchase MCS's assets. This offer was not acceptable to Gates and the parties negotiated purchase terms for some time. During this period, Altman sent a letter to Gates explaining that he was no longer an interested investor but would continue to represent Rankin and Bales. The letter also explained that Bales and Rankin would form a limited liability corporation to act as buyer in the purchase of MCS's assets. *See* Appellant's App. p. 60. Shortly thereafter, Robert Cochrane took Altman's place as an investor and joined Bales and Rankin in their bid.

The parties ultimately agreed to purchase terms and scheduled closing for June 26, 2000. On that day, Cochrane, Bales, and Rankin (collectively, "the shareholders") signed the necessary paperwork to create CBR Event Decorators, Inc., the corporate buyer in the transaction with Gates. The shareholders also deposited $110,000 into Altman's escrow account to fund the agreed-upon $100,000 down payment, as well as Altman's $10,000 legal fee. At the time of the transaction, CBR did not possess capital to pay its $550,000

3

obligation on the promissory note delivered to Gates. However, the amount due on the note was to be paid over a seven-year period and the first payment was not due until January 2001. *Id.* at 309.

Rankin read and signed the purchase agreement on behalf of CBR. Notably, section eighteen of the purchase agreement contained a standard merger clause, which stated, "This Agreement constitutes the entire agreement between the parties and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth or provided for in this agreement." *Id.* at 311.

Altman wrote a check from his trust account for $100,000 payable to Gates. Cochrane then mailed the signed documents and check to Gates. When Gates received the documents and check the following morning, he signed both original documents, returned one original to Rankin, and endorsed the check. That morning, the shareholders met with employees at MCS's offices. After meeting with employees for a short time, the shareholders left the offices.

Immediately after leaving MCS's offices, the shareholders contacted Altman. They claimed that after closing they learned that MCS's status with regard to clients had been misrepresented, and the company's relationship with certain clients was damaged. Altman contacted Gates and informed him that the shareholders wanted to delay the transaction, renegotiate the contract, and stop payment on the check. Gates responded by stating that he would hold the check to allow the shareholders to present evidence of their claims, but he did not want the shareholders to stop payment on the check. The shareholders retained new counsel, Scott Treadway. Treadway contacted Gates.

4

Treadway accused Gates of making misrepresentations and defrauding the shareholders, but he did not elaborate. Later that day, Altman stopped payment on the check at the shareholders' direction.

The next day, Treadway sent a letter to Gates with proposed terms for renegotiation. Gates rejected the proposed terms and demanded information regarding the alleged misrepresentations. Gates again retained Jay Kennedy, who responded to Treadway's letter, demanding that the shareholders rectify the stop payment on the $100,000 check and properly ratify the purchase agreement. The shareholders did not comply with Gates's demands. Instead, they withdrew the $100,000 from Altman's trust account. Gates never transferred any assets to CBR.

Gates subsequently liquidated MCS's assets. Gates initiated suit against CBR in August 2000, claiming breach of contract and arguing that the corporate veil of CBR should be pierced to allow the imposition of personal liability on the shareholders. CBR counterclaimed, alleging that Gates had fraudulently induced it to enter the purchase agreement.

Following the failed transaction, CBR lay dormant. The corporation's records consisted of eighteen pages and contained a single corporate resolution. Though the corporation had no capital, the shareholders planned to inject cash when needed for corporate obligations. As legal proceedings progressed, CBR informally indemnified its shareholders.

A bench trial began in the fall of 2005. After submitting proposed findings of fact and conclusions of law, the parties waited for nearly two years without a decision from

the trial court. In late 2007, due to the original trial court's inaction, our Supreme Court withdrew the case and appointed a special judge. More than a year later, in August 2009, a second bench trial began. At the conclusion of proceedings, the parties again submitted proposed findings of fact and conclusions of law. In September 2010, the trial court accepted in full Gates's proposed findings of fact and conclusions of law and ruled for Gates on all issues, including Gates's claim that CBR's corporate form should be disregarded to impose personal liability on the shareholders. The trial court entered judgment in favor of Gates for $260,815.77 plus interest and attorney's fees. *Id.* at 138. The judgment accounted for the amount due to Gates for the shareholders' breach of the purchase agreement and default on the promissory note, offset by Gates's mitigation of his damages. The trial court also found that the shareholders had fraudulently conveyed $100,000 by withdrawing it from Altman's trust account and ordered the shareholders to pay Gates that amount. *Id.* at 117-21. The trial court concluded that CBR's counterclaim of fraudulent inducement was without merit.

To justify the decision to pierce the corporate veil, the trial court determined that CBR was undercapitalized, lacked corporate records, and the shareholders had fraudulently represented to Gates in the purchase agreement that there were no representations, warranties, or understandings other than those set forth or provided for in the purchase agreement. The trial court stated that the shareholders "knowingly traded off any representations outside the agreement in return for obtaining limited liability of the corporate form," but they nonetheless "attempted to back out of the agreement based on oral representations outside the agreement . . . ." *Id.* at 127. Notably, the court did not

find that the shareholders lacked intent to perform under the agreement nor did it find that CBR was created to allow the shareholders to withdraw the down payment amount and assert the protection of limited liability. Finding that the shareholders had "abused the corporate form to promote both fraud and injustice," *id.*, the trial court pierced CBR's corporate veil and held the shareholders individually liable. The shareholders now appeal.[1]

## Discussion and Decision

The shareholders raise a single issue on appeal: whether the trial court's unchallenged findings of fact support the court's decision to pierce the corporate veil. They contend that Gates failed to establish misuse of the corporate form constituting a fraud or promoting injustice. Further, the shareholders argue that the trial court's judgment ignores the pertinent business transaction context here, the creation of a corporate entity for a limited purpose.

## I. Standard of Review

Because the trial court entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Mueller v. Karns*, 873 N.E.2d 652, 657 (Ind. Ct. App. 2007), *reh'g denied.* We determine first whether the evidence supports the findings and then determine whether the findings support the judgment. *Id.* We will not reverse the trial court's findings or the judgment unless clearly erroneous. Ind. Trial Rule 52(A); *Mueller*, 873 N.E.2d at 657. A finding is clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support it. *Id.* The judgment is

---

[1] We heard oral argument in this case on December 15, 2011. We appreciate the quality of the arguments on both sides.

7

clearly erroneous when it is unsupported by the findings and the conclusions. *Id.* In conducting this review, we neither reweigh evidence nor judge witness credibility and consider the evidence in a light that is most favorable to the judgment. *Id.* We owe no deference to conclusions of law, however, and therefore apply a *de novo* standard of review. *Id.*

We note that the trial court adopted Gates's proposed findings of facts and conclusion of law verbatim. *See* Appellant's App. p. 35. Although a trial court is not prohibited from adopting a party's proposed findings verbatim, this practice is discouraged. *In re Adoption of A.S.*, 912 N.E.2d 840, 851 (Ind. Ct. App. 2009), *trans. denied*. Ultimately, the trial court is responsible for the correctness of the findings. *Id.* As such, adoption of Gates's proposed findings was not in and of itself improper. However, the wholesale adoption of one party's findings results in an "inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court." *Prowell v. State*, 741 N.E.2d 704, 709 (Ind. 2001).

## II. Piercing the Corporate Veil

The basic principle of corporate law is that corporate shareholders are liable for acts of the corporation only to the extent of their investment and are not personally liable for the corporation's acts. *Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004). Courts are reluctant to disregard corporate identity and do so only where the party seeking to pierce the corporate veil can establish that the corporate form has been misused and the result of that misuse is fraud or injustice. *Id.* Put differently, courts will not provide the protection of limited liability to an entity that is a mere instrumentality of

8

another and engages in misconduct in the function or use of the corporate form. Whether the party seeking to disregard corporate existence has met this burden is a highly fact-sensitive question. *Cmty. Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 565 (Ind. Ct. App. 2002), *trans. denied*. The party seeking to pierce the corporate veil bears the burden of establishing that: (1) the corporate form was "so ignored, controlled or manipulated that it was the mere instrumentality of another" and (2) "that the misuse of the corporate form would constitute a fraud or promote injustice." *Escobedo*, 818 N.E.2d at 933.

In deciding whether this burden has been met, Indiana courts consider whether the party seeking to pierce the corporate veil has presented evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. *Id.* (citing *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994)). This list is not exhaustive in that not all factors must be shown to support a determination that the corporate veil should be pierced. *Longhi v. Mazzoni*, 914 N.E.2d 834, 839 (Ind. Ct. App. 2009), *trans. denied*.

The trial court found that each of the eight factors listed above were implicated by the evidence and justified its decision to pierce the corporate veil. On appeal, the shareholders contend that the trial court erred in finding misuse of the corporate form

9

constituting a fraud or promoting injustice. More specifically, the shareholders emphasize the causal link required by the second prong of *Escobedo* by stating that where fraud is alleged, it must be accomplished through misuse of the corporate form.

A review of cases regarding corporate identity shows that a causal connection proves essential to a court's analysis. In *Hart v. Steel Products*, this Court affirmed a trial court's decision to pierce the veil where a corporate agent misrepresented the corporation's financial position. 666 N.E.2d 1270, 1277 (Ind. Ct. App. 1996), *trans. denied*. In so doing, we noted that had the Harts known the true financial status of the corporation, they would have acted differently in their dealings with the corporation. *Id.* Relevant to our decision to pierce the corporate veil in *Fairfield Development, Inc., v. Georgetown Woods Senior Apartments Ltd. Partnership* was evidence that an alter ego corporation misrepresented its age, experience, and the identity of its directors. 768 N.E.2d 463, 472 (Ind. Ct. App. 2002), *trans. denied*. In *Longhi v. Mazzoni*, a causal connection between misuse of the corporate form and fraud existed where Longhi made false and misleading representations about a building corporation to the Mazzonis and did not inform them that he was using them to raise capital for the corporation. 914 N.E.2d 834, 843 (Ind. Ct. App. 2009), *trans. denied*. Importantly, we have declined to disregard corporate identity where a party seeking to pierce the corporate veil failed to "designate[] evidence [establishing that] these corporations abused the corporate form or that *such abuse would result in a fraud or injustice* to him." *Massey v. Conseco Servs., L.L.C.*, 879 N.E.2d 605, 609 (Ind. Ct. App. 2008) (emphasis added), *trans. denied*. Our resolution of the aforementioned cases supports the shareholders' assertion that the fraud or injustice

10

alleged by a party seeking to pierce the corporate veil must be caused by, or result from, misuse of the corporate form.[2]

Although our inquiry is a fact-sensitive one, the facts here are not in dispute. Gates was informed during the negotiation stage that CBR was being formed for the sole purpose of purchasing his event-decorating assets. As such, before entering into the agreement with CBR, Gates was aware, or should have been aware, that the fledgling corporation would possess many of the attributes Gates would later point to as evidence of abuse of the corporate form, such as a lack of corporate records. At the time of formation, CBR possessed capital for the initial $100,000 down payment to Gates. Though the corporation also had an obligation to repay the amount due on the promissory note, CBR had seven years to do so, and the first payment was not due until six months after closing. The shareholders intended to capitalize future payments and contribute funds for operation of the business through capital contributions, a practice common in the corporate context.

Critically, the fraud alleged by Gates has nothing to do with misuse of the corporate form. The fraud alleged is that the shareholders represented, under the standard

---

[2] The necessity of this causal connection between misuse of the corporate form and fraud or injustice was articulated in *N.L.R.B v. Greater Kansas City Roofing*. In *N.L.R.B*, the federal court explained that

> It should be emphasized that the showing of inequity necessary to satisfy the second prong must flow from the misuse of the corporate form. The mere fact that a corporation commits an unfair labor practice, or breaches a contract, or commits a tort, does not mean that the individual shareholders of the corporation should personally be liable. To the contrary, the corporate form of doing business is typically selected precisely so that the individual shareholders will not be liable. It is only when the shareholders disregard the separateness of the corporate identity *and when that act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced.

2 F.3d 1047, 1053 (10th Cir. 1993) (emphasis in original) (citations omitted).

11

merger clause contained in the purchase agreement, that there were no representations, warranties, or understandings other than those set forth in the purchase agreement. Yet, after the transaction, they claimed that Gates had made certain oral promises. Even if this were true, this alleged fraud does not flow from any misuse of the corporate form; it has no nexus to the corporate form.[3] By contrast, statements pertaining to the status of a corporation, such as a corporation's solvency, age, reputation, or the identity of its directors have such a nexus. Here, the necessary causal link does not exist because the alleged misrepresentation does not pertain to CBR's corporate status.[4]

Nor is this causal connection found within Gates's argument that the shareholders secured the benefit of proceeding as a corporate buyer in exchange for inserting the merger clause in the contract. There was no evidence that the shareholders ever intended to proceed with the transaction as individuals. Even if that were the case, a causal connection between misuse of the corporate form and fraud or injustice would still be lacking. Absent a finding by the trial court that the shareholders formed CBR with intent at the time of formation to later breach the purchase agreement and hide behind the shield of limited liability, there is no fraud or injustice flowing from misuse of the corporate form, and piercing the corporate form is not warranted.[5]

---

[3] Because we resolve this issue as we do, we need not address the parties' additional arguments regarding the merger clause at issue.

[4] We need not reach the issue of whether this amounts to fraud because even if we assume fraud, that fraud must flow from misuse of the corporate form. Further, although the trial court found, and Gates argues on appeal, that the shareholders abused the corporate form to "promote both fraud *and* injustice," Appellant's App. p. 127, the underlying rationale provided for the injustice finding is the fraud as discussed here. *Id.* at 31.

[5] Since no assets were transferred to CBR, it would have been difficult to make a finding that CBR entered into the agreement with intent to immediately breach it.

To the extent that the trial court implied, and Gates argues on appeal, that the shareholders' transfer of the $100,000 down payment from Altman's trust account after closing constitutes a fraud that justifies piercing the corporate veil, this argument also fails our causal analysis. *See* Appellant's App. p. 127; Appellant's Br. p. 31. The transfer at issue involved $100,000 placed into Altman's trust account on the same day CBR was created and the shareholders signed the purchase agreement. Those funds were withdrawn one day later. As already discussed, there was no finding by the trial court that the shareholders contemplated forming a corporation for the purpose of later withdrawing these funds and hiding behind the shield of limited liability. Similarly, there was no finding by the trial court that, at the time CBR was formed, the shareholders intended to later withdraw those funds and deprive Gates of them. Given the facts here, and without any evidence of such intent, the transfer cannot be the basis for a finding of misuse of the corporate form constituting a fraud.

Because Gates failed to establish a causal connection between misuse of the corporate form and fraud or injustice, we conclude that the trial court erred in piercing the corporate veil. We note that CBR does not appeal the judgment against it for breach of contract. The shareholders also do not appeal the judgment against them for fraudulent conveyance, fraudulent transfer, or wrongful stop payment. *See* Appellant's App. p. 119-21. We therefore affirm in part and reverse in part. We affirm the trial court's judgment against the shareholders for $100,000 for fraudulent conveyance, fraudulent transfer, and wrongful stop payment of a check. We reverse, however, the trial court's judgment against the shareholders in all other respects. Further, we remand to the trial court to

13

determine the portion of attorney fees the shareholders are liable for to Gates as a result of the wrongful stop payment.

Affirmed in part, reversed in part, and remanded.

FREIDLANDER, J., and DARDEN, J., concur.