# FOR PUBLICATION



FILED

Feb 12 2014, 8:40 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**KARL L. MULVANEY**
**GRANTLAND M. CLAPACS**
**MARGARET M. CHISTENSEN**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**GREGORY W. BLACK**
Gregory W. Black, P.C.
Plainfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

COUNTRY CONTRACTORS, INC.,            )
STEPHEN SONGER, and JAHN SONGER,      )
                                      )
    Appellants-Defendants,            )
                                      )
        vs.                       )    No. 32A01-1304-CC-155
                                      )
A WESTSIDE STORAGE OF                 )
INDIANAPOLIS, INC.,                   )
                                      )
    Appellee-Plaintiff.               )

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable Mark A. Smith, Judge
Cause No. 32D04-0905-CC-155

**February 12, 2014**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Country Contractors, Inc. ("Country") entered into a contract to provide excavation services for A Westside Storage of Indianapolis, Inc. ("Westside"). Country subcontracted out a substantial portion of the work and eventually left the worksite without completing the job. Westside filed a breach of contract action against Country and its two shareholders, Stephen Songer and Jahn Songer ("the Songers"). Following a bench trial, the trial court entered judgment against Country and against the Songers personally for breach of contract and slander of title.

Country and the Songers (collectively, "Appellants") now appeal, claiming that the trial court clearly erred in piercing the corporate veil as to the Songers and in finding in favor of Westside on its slander of title claim. They also challenge the trial court's award of attorney's fees and delay damages. Finding the evidence insufficient to support the trial court's decision to pierce the corporate veil, we reverse the judgment as to the Songers. Finding the evidence sufficient to support the trial court's conclusion that Country slandered Westside's title, we affirm that portion of the trial court's judgment. With respect to damages, we affirm the trial court's award of attorney's fees and reverse its award of delay damages. We remand for a recalculation of prejudgment interest.

**Facts and Procedural History**

In 1983, the Songers formed Country Concrete, Inc., which was in the business of providing ready-mix concrete. The original officers were Stephen, his wife Jahn, and his mother Dorothy, now deceased. In the 1990s, the corporation began to expand its services to

2

include general contracting for construction projects and excavation. It maintained an inventory of about 150 to 200 pieces of equipment, which it rented to other companies. In January 2007, acting on the advice of its insurance agent, Country Concrete filed an amendment to its articles of incorporation, changing its name to Country Contractors, Inc. Jahn was president, and Stephen was vice president. The two comprised the board of directors and shareholders. Corporate operations were handled by Jeff Baker, Lewis Smith, and Doug Pribbeno. The three men participated in bid preparation, contract execution, and project supervision. Although the corporation had enjoyed some profitable years, by 2007 and 2008 it was operating at a loss, due partly to its inability to collect outstanding balances from bankrupt customers.

In August 2007, Westside entered into negotiations with Pribbeno for Country to provide earthwork and construct a storm sewer on one of Westside's properties. Baker executed a contract proposal, and the parties eventually amended the contract to expand the work and increase the contract price from $202,855 to $235,000. The signatories to the contract and amendment were Pribbeno (for Country) and Larry Nielsen (for Westside).[1] Although Country performed some of the excavation, Pribbeno hired out much of the project to O&M Excavating ("O&M"), which in turn contracted with Everett J. Prescott, Inc. ("Prescott"), Littleton & Sons Sand & Supply, Inc. ("Littleton"), and VCNA Prairie Aggregate ("Prairie") to provide materials for the project. The Songers were not involved in

---

[1] Nielsen's name is spelled numerous ways throughout the record. However, we have chosen the spelling based on his signature as contained in the exhibits. *See*, *e.g.*, Plaintiff's Exs. 2, 3.

3

the Westside contract.

Country and O&M began work on the project in mid- to late summer of 2008. During the fall of 2008, Westside paid Country $191,535.72 on the contract. Also during that time, O&M sent Country a series of invoices. Country paid O&M's first four invoices but did not pay the final invoice for $38,182.23, which it claimed never to have received. By the end of 2008, Country stopped working on the Westside project, which was not complete. In February 2009, O&M, Prescott, Littleton, and Prairie filed notices of intent to hold mechanic's liens on Westside's property. In May 2009, Westside paid the four mechanic's lien claimants in order to extinguish the liens and satisfy the bank holding the mortgage on the property. That same month, Country filed a notice of intent to hold a mechanic's lien on Westside's property land in the amount of $38,125. A couple months later, Westside contracted with John Hall Construction ("Hall") to complete the project for $33,137.14. From beginning to end, Westside paid $286,162.86 in order to complete the project.

In May 2009, Westside filed a breach of contract action against Country, alleging failure to complete performance and failure to pay subcontractors and demanding an accounting of the payments it had made to Country on the contract. Westside later amended its complaint, joining the Songers as defendants and requesting a declaratory judgment piercing the corporate veil to hold these defendants personally liable for Country's breach of contract. With respect to the declaratory judgment request, Appellants filed a motion for partial summary judgment, which the trial court denied.

4

At the ensuing bench trial in January 2013, Westside sought damages for breach of contract and slander of title. Appellants requested that the trial court issue findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). On March 11, 2013, the trial court issued its findings, conclusions, and judgment in favor of Westside against Country and against the Songers personally. The $117,542.20 damage award consisted of $51,162.86 in additional costs to complete the Westside project; $14,959.34 in prejudgment interest; $17,500.00 in attorney's fees; and $33,920.00 in damages for delay of the project caused by Country's breach. Appellants' App. at 129. This appeal ensued.[2] Additional facts will be provided as necessary.

**Discussion and Decision**

Appellants challenge the sufficiency of evidence to support the trial court's judgment in favor of Westside on the issues of piercing the corporate veil, slander of title, attorney's fees, and delay damages. Where, as here, the trial court issues findings of fact and conclusions of law pursuant to a party's request, we apply a two-tiered standard of review. *Baird v. ASA Collections*, 910 N.E.2d 780, 785 (Ind. Ct. App. 2009), *trans. denied* (2010). We first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id*. We review for clear error and will reverse only if the trial court's findings are unsupported by any evidence or reasonable inferences drawn from the evidence or if the judgment is unsupported by the findings and conclusions. *Id*. In

---

[2] We conducted oral argument on January 14, 2014, and we thank counsel for their time and preparation.

5

conducting our review, we neither reweigh evidence nor judge witness credibility; rather, we consider the evidence in the light most favorable to the judgment. *Id*. With respect to the trial court's findings of fact, we defer substantially; with respect to its conclusions of law, we apply a de novo standard. *Id*.

Here, the trial court's findings include the following:

10.	In early September 2007, Westside entered into a contract with Country for the latter to provide earthwork and storm sewer construction for the job on the property owned by Westside …. The contract was signed by Larry Nielsen for Westside and Doug Prebbino [sic] for Country.

11.	The original contract was for $96,145.00 for earthwork and $106,710.00 for storm sewer, totaling $202,855.00.

12.	In 2008, the parties amended the original contract. According to Exhibit 2, the contract price increased $32,145.00 for a total price of $235,000.00.

13.	Work on the project began sometime in 2008. No work is shown in the record until early September 2008 by O&M Excavating, owned by Brad Empson. Mr. Empson testified to being hired by Country through Doug Prebbino [sic].

14.	O&M hired Everett J. Prescott, Inc., Littleton & Sons Sand & Supply, Inc., [and] VCNA Prairie Aggregate … as subcontractors to do the work apart from excavating.

15.	Exhibit 12 is several invoices from O&M to Country Contractors. The total billed by O&M is $165,976.36. The invoices and dates are:

	a.	9/4/08—$66,454.72
	b.	9/9/08—[$]13,249.38
	c.	11/3/08—$3,332.43
	d.	11/3/08—$44,757.60
	e.	12/17/08—$38,182.23

16.	After December 2008, no work was done on the project until approximately July 2009.

6

17. Country Contractors did not return to the job site after December 2008. According to its interrogatory answers (Exhibit 56), Country believed the job was completed in 2008 and "pulled out" in March 2009. Larry Nielsen was unaware Country had quit the job.

18. On February 6, 2009, O&M Excavating caused a notice of intent to hold mechanic's lien to be recorded for the work and materials on this job. The lien amount was for $38,182.23.

19. On February 10, 2009, Everett J. Prescott caused a notice of intent to hold mechanic's lien to be sent to Westside for $19,102.29 for work and materials on this job.

20. On February 13, 2009, Littleton & Sons Sand and Supply caused a notice of intent to hold mechanic's lien to be recorded for work and materials on this job. The lien amount was $4,896.32.

21. On February 17, 2009, VCNA Prairie Aggregate caused a notice of intent to hold mechanic's lien for work and materials on this job. The lien amount was $9,177.71.

22. In May 2009, Westside satisfied the lien claims of O&M Excavating, Everett J. Prescott, Littleton & Sons, and VCNA Prairie Aggregate. Westside paid $39,498.00 to the four (4) subcontractors to satisfy the liens.

23. In July 2009, Westside hired John Hall Construction to finish excavation work. John Hall provided stone, gravel, sand & grade work, blanketing & seeding swales, excavation, and installation of silt fences.

24. On July 9, 2009, John Hall Construction billed Westside $29,104.64 for work performed by it on this job.

25. On April 8, 2010, John Hall Construction billed Westside $4,032.50 for work performed by it on this job.

26. Westside paid John Hall $33,137.14.

27. Westside paid a total of $191,527.72 to Country. Westside wrote four (4) checks to Country as follows:

    a.    9/8/08—$14,000.00

7

b.  9/10/08—$74,676.72
c.  10/30/08—$56,681.00
d.  12/1/08—$46,170.00

28.  As a result of the lien payments, payments Westside made directly to Country Contractors, and payments to John Hall Construction, Westside paid a total of $264,162.86.

29.  In addition, Westside paid an additional [sic] $22,000.00 to pay [sic] for a water line.

….

31.  According to [Country Contractors' bookkeeper Patricia] Hambright, of the total money paid to Country by Westside, $116,000.00 was paid to O&M Excavating and Country paid itself approximately $74,000.00.

32.  There is no record of any invoice submitted by Country for work done by Country.

33.  Hambright is unaware of the subcontracts as to the Westside job. Hambright knows nothing of Prairie, Littleton, or Prescott.

34.  The only assets Country Contractors ever owned was [sic] approximately 150-200 pieces of equipment that were financed from various lenders, and some accounts receivable of an unknown amount.

35.  No one testified to the work Country performed at the site. Larry Nielsen knows of none. Larry Nielsen testified a piece of equipment was left at the site, apparently by Country. Brad Empson of O&M Excavating saw Country work on site.

36.  No one testified that any work done on the Westside job was wrong, or inconsistent with the plans.

37.  The Westside job is the last job done by Country Contractors.

38.  In May 2009, Country recorded a lien claim against the Westside land, asking the $38,125.00 be paid to Country by Westside. The claim could not have been recorded within 60 days of the last work done by Country as nothing was done after early December 2008. The lien notice was signed by Jahn Songer. There was no notice of the lien to

8

Westside. The first Westside knew of the lien claim was when Country filed its counterclaim. At close of trial, Country dismissed its counterclaim upon the line with prejudice to further action.

….

40. There is no accounting by Country of what Country kept from the funds paid to Country by Westside. There is no accounting of what Country's payees did to earn the money paid them or whether the payments were for the Westside job.

41. Neither Stephen Songer nor Jahn Songer, claim any ability to testify to the Westside contract or its performance in any detail.

42. Exhibit 53 shows Country Concrete, predecessor to Country Contractors, in 2003 had assets of $410,944.00, accounts payable of $465,944.00, no mortgage debt.

43. In approximately 2006, Country had long-term liabilities of about $4,000,000.00.

44. As of December 31, 2007, Country Contractors was in a negative equity position of over $700,000.00.

45. There was no equity in the corporation in 2008.

46. At the time of trial, Country Contractors was in bankruptcy.

47. Country's abandonment set Westside back about a year. The delay caused Westside damage of approximately $33,920.00

48. Westside has incurred $17,500.00 in legal fees.

49. Country failed to finish the work and failed to pay the final installment owed O&M.

50. Country is spare on corporate formality. The annual meeting minutes, 2007 through 2009, are "boilerplate." In discovery responses, Country produced three (3) annual meeting minutes and the minutes changing the corporate name. According to the records, all is satisfactory, even though the corporation foundered in 2008 and by 2009 was over a million dollars in [the] red.

51. Jahn, the president, [and] Steve, the vice president, knew little of the corporation or its affairs.

52. Country paid Jahn Songer over $50,000.00 a year in salary in 2007 and 2008.

Appellant's App. at 119-24.

The trial court pierced the corporate veil and found that Westside's title was slandered, concluding in pertinent part,

1. In general, corporate shareholders are not personally liable for the acts of a corporation.

2. The party seeking to pierce the corporate veil bears the burden of establishing that the corporation was so ignored, controlled, or manipulated that it was merely [the] instrumentality of another and that misuse of [the] corporate form would constitute fraud or promote injustice.

3. Indiana courts are reluctant to disregard a corporate entity, but will do so as a matter of equity to prevent fraud or unfairness to third parties.

4. In determining whether a party seeking to pierce the corporate veil has met its burden of showing that the corporate form was abused, a court considers [eight factors].

5. The plaintiff is not required to prove each factor …. This list is not exhaustive in that not all factors must be shown to support a determination that the corporate veil should be pierced.

….

7. One way to pierce a veil is to find the corporation was undercapitalized in relation to the amount of risk it undertakes.

8. A finding of undercapitalization weighs in favor of piercing the veil.

9. The adequacy of capital is to be measured as of the time of a corporation's formation. "A corporation that was adequately capitalized when formed, but which subsequently suffers financial

10

reverses is not undercapitalized."

10. However, if an adequately capitalized corporation later substantially expands the size or nature of the business with an attendant substantial increase in business hazards, the corporation might be deemed inadequately capitalized unless there is an infusion of additional risk capital by shareholders.

11. While a trial court's examination of the adequacy of capitalization may inquire beyond the capitalization at the inception of the corporation, such inquiry is limited to those circumstances where the corporation distinctly changes the nature or magnitude of its business.

12. Another way to pierce a veil is to find an absence of corporate records.

13. Indiana Code § 23-1-52-1 requires a corporation to keep as permanent records all actions taken by its shareholders or its board, taken without a meeting, and it states a corporation shall "maintain appropriate accounting records."

14. A veil may also be pierced for disregarding corporate formalities.

15. Lack of attention to corporate formalities is common in family corporations.

16. Authority of this Court to pierce does not depend on the existence of any specific set of facts, but rather upon the need to prevent unfairness.

17. The need to prevent unfairness to Westside is paramount in this case. In good faith, Westside hired what it assumed [to be] a viable entity, never alerted that Country had no available assets. Westside paid money, sufficient in sum to satisfy all debt that had accrued to its land, to avoid lien claims. Country did not pay what it had agreed to pay, what it had been paid to pay. Country was not operated efficiently, with adequate records. There is no evidence it ever has properly documented its affairs or records, to account to anyone for anything. All it has is a bank account, meager paperwork and assets owned by its financiers.

18. Undercapitalization and misuse of the corporate form have caused the damages Westside has suffered. To be capitalized is to have capital unencumbered. Capital that is encumbered to another cannot be

11

counted as "capitalized," the purpose of being capitalized, as opposed to being undercapitalized, is to protect others from fraud, injustice. Country had no capital at all. It was not just undercapitalized, it was not capitalized altogether, as of September 2008 when O&M began work for Westside.

19. Country was unable to produce accounting records to demonstrate the work it did or the value of its work in this job. Country retained over $74,000.00 from Westside, not paying the final $38,123.00 owed to its chief subcontractor, O&M. But Country paid other bills through March of 2009 with money that could have been used to fulfill its duty to Westside here.

20. Defendants produced just thee [sic] (3) copies of minutes, meager at that, with no copies of corporate resolutions or any ledgers of stock, or stock certificates. There is no record of any substantive corporate decision, or who the stockholders are, or what amount of stock each owner owns.

….

23. Indiana Code [Sections] 32-20-5-1, 2 forbids [sic] slander of title, and permits [sic] a Court to award legal fees and damages when slander occurs. Here, Country filed a lien notice against Westside's land, seeking over $38,182.23 for money Westside already had paid for work done by companies hired by Country, companies not paid by Country. The lien notice was filed even when Westside reached in and paid another $39,000.00 plus to pay the companies Country should have paid, had been given the money to pay. The lien claim slanders title of Westside.

24. The legal fees of $17,500.00 incurred by Westside are reasonable.

….

28. Country Contractors, Inc. is liable to Westside in the sum of $117,542.20 as follows: $51,162.86 for the difference between the contract price of $235,000.00 and what Westside actually paid $286,162.86 (including payments to Country, payment of liens, payment to John Hall and payment for the water line); $14,959.34 for pre-judgment interest from April 8, 2010 to the date of judgment ($14.02/day x 1067 days); $17,500.00 in attorney fees; $33,920.00 for

the additional money lost [sic] caused by the delay due to Country's breach.

29. Stephen Songer and Jahn Songer are personally liable for the obligations owed by Country to Westside. They operated their company with no capital and disregarded the formalities of corporate record keeping. The corporation is now bankrupt. Westside has been damaged and has no other recourse. It would be unjust in this case to permit the Songers to escape personal liability by not piercing the corporate veil.

*Id*. at 124-30 (citations omitted).

## *I. Piercing the Corporate Veil*

The Songers contend that the trial court clearly erred in concluding that they are personally liable to Westside for Country's liabilities. For over a century, a fundamental principle of both American corporate law and Indiana common law has been that corporate shareholders sustain liability for corporate acts only to the extent of their investment and are not held personally liable for acts attributable to the corporation. *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994). In 1986, the Indiana General Assembly codified this principle, stating, "Unless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation." Ind. Code § 23-1-26-3(b). Within the same provision, the General Assembly also codified the exception known as "piercing the corporate veil," wherein "the shareholder may become personally liable by reason of the shareholder's own acts or conduct." *Id*.

> Because of the bedrock nature of the principle of limited shareholder liability, the burden on a party seeking to pierce the corporate veil is severe. Such a party may only recover from a shareholder if the party proves by a preponderance of the evidence that [(1)] the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and

13

[(2)] that the misuse of the corporate form would constitute a fraud or promote injustice.

*Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930, 933 (Ind. 2004) (quoting *Aronson*, 644 N.E.2d at 867) (internal quotation marks omitted).  In other words, "courts will not provide the protection of limited liability to an entity that is a mere instrumentality of another and engages in misconduct in the function or use of the corporate form."  *CBR Event Decorators, Inc. v. Gates*, 962 N.E.2d 1276, 1281-82 (Ind. Ct. App. 2012), *trans. denied*.

In determining whether a plaintiff seeking to pierce the corporate veil has met its burden concerning the *Aronson* test, the trial court considers whether the plaintiff has presented evidence showing:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Aronson*, 644 N.E.2d at 867.  The list of factors is not exhaustive, and the plaintiff need not prove all eight factors in order to pierce the corporate veil.  *Longhi v. Mazzoni*, 914 N.E.2d 834, 839 (Ind. Ct. App. 2009), *trans. denied* (2010).

The trial court found that Country was undercapitalized and failed to respect corporate formalities by failing to maintain adequate records.  The court did not enter findings on any of the other factors.  In its conclusions of law, the trial court cited *Ziese & Sons Excavating,*

14

*Inc. v. Boyer Constr. Corp.*, 965 N.E.2d 713, 721 (Ind. Ct. App. 2012),[3] stating that its authority "to pierce does not depend on the existence of any specific set of facts, but rather upon the need to prevent unfairness." Appellants' App. at 127. Certainly, preventing fraud and unfairness to third parties is an important prong in our analysis. *See Ziese*, 965 N.E.2d at 721 ("The authority of the courts to disregard corporate identity does not stem from the existence of a specific factual circumstance, but rather from the necessity of preventing fraud or unfairness to third parties."). However, it is not enough merely to establish one prong of the test. Rather, it is essential that the plaintiff establish a causal connection between the first and second prong of the test. *Gates*, 962 N.E.2d at 1282. In other words, "the fraud or injustice alleged by a party seeking to pierce the corporate veil must be *caused by, or result from*, misuse of the corporate form." *Id*. at 1282-83 (emphasis added).

> The mere fact that a corporation commits an unfair labor practice, or breaches a contract, or commits a tort, does not mean that the individual shareholders of the corporation should personally be liable. To the contrary, the corporate form of doing business is typically selected precisely so that the individual shareholders will not be liable. It is only when the shareholders disregard the separateness of the corporate identity *and when that act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced.

*Id*. at 1283 n.2 (citation and quotation marks omitted).

In *Escobedo*, our supreme court emphasized that a court may not disregard the corporate form merely to "promote substantial justice." 818 N.E.2d at 935. Rather, the

---

[3] *Ziese* involved the issue of whether one corporation was simply the alter ego of another. 965 N.E.2d at 721. It is procedurally distinguishable from the present case in that it was an appeal from a denial of summary judgment. As such, the *Ziese* court emphasized the fact-sensitivity of inquiries concerning the piercing of the corporate veil. *Id*.

evidence must show that the shareholders "misuse[d] the corporate form to promote injustice." *Id*. There, former employees of a defunct corporation and the corporation's union sued the two sole shareholders/officers/directors individually for unpaid wages and union dues. In its last month of operation before selling all of its assets to a successor business, the corporation paid its employees their first two weeks' wages and paid the Internal Revenue Service $70,000 toward a $200,000 corporate tax liability which the two shareholders had personally guaranteed. *Id*. at 931-32. In seeking the two weeks' unpaid wages and dues, the plaintiffs asked the trial court to pierce the corporate veil. The trial court applied the two-pronged test and found no basis for piercing the corporate veil. Our supreme court affirmed, finding nothing to support a conclusion that the two individual shareholders "so ignored, controlled, or manipulated the corporate form that it was merely their instrumentality" to promote injustice. *Id*.

Here, the Songers did not use the corporation as a mere instrumentality to engage in misconduct to their own benefit. Instead of dominating the corporation, they seemed disconnected. Westside admits that the Songers had no involvement in their contract and states that their dealings were with Pribbeno, who did not testify and whose whereabouts were unknown at the time of trial. Appellee's Br. at 3.[4] The record shows that Baker also participated in drafting the contract proposal and in dealing with Hambright concerning the bookkeeping and payment on the contract. Defendant's Ex. A; Plaintiff's Ex. 63.

---

[4] In her capacity as president, Jahn Songer signed the May 27, 2009 notice of intent to hold mechanic's lien.

Notwithstanding their apparent lack of direct connection to the Westside contract, the question is whether the Songers failed in more general ways to respect the corporation as a separate entity.

In this vein, the trial court cited Country's undercapitalization and the Songers' failure to respect such corporate formalities as keeping adequate records. Capitalization is inadequate when it is very small in relation to the nature of the corporation's business and risks attendant to such businesses. *Cmty. Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 565 (Ind. Ct. App. 2002), *trans. denied* (2003). Because the adequacy of capital is measured as of the time of the corporation's formation, a corporation that was adequately capitalized when formed but subsequently suffers financial reverses is not undercapitalized. *Id*. However, if an adequately capitalized corporation subsequently "substantially expands the size or nature of its business with an attendant substantial increase in business hazards, the corporation might be deemed inadequately capitalized unless there is an infusion of additional risk capital by shareholders." *Id*. This post-formation capitalization inquiry will be made only in circumstances in which a corporation "distinctly changes the nature or magnitude of its business." *Id*.

Here, the corporation was originally formed in 1983 as Country Concrete, Inc. It ran at a profit for many years, up to and including 2006. In January 2007, the corporation renamed itself as Country Contractors, Inc., to more accurately reflect its recently expanded services beyond the mere provision and pouring of concrete. The record shows that by the end of 2007, Country was operating at a loss. Plaintiff's Ex. 34. Its year-end balance sheets

show net operating losses in 2007, 2008, and 2009. *Id.* It remained a corporation in good standing with the Indiana Secretary of State through 2009. Simply put, Country was not undercapitalized either at its inception or as of the date it amended its articles. Westside failed to establish that Country's dwindling capital was due to anything other than a general downturn in the economy and a specific downturn in the construction industry.

With respect to corporate formalities and recordkeeping, "a corporation should be operated as a distinct and separate business and financial unit, with its own books, records, and bank accounts." *Cmty. Care Ctrs.*, 774 N.E.2d at 569 (citation omitted). Factors indicating a failure to respect the separateness of the corporate entity include shareholder use of corporate funds for personal purposes or the commingling of accounts or assets. *Id.* The record shows that Country conducted all of its corporate business from one bank account. Westside cites the single bank account as evidence of the Songers' failure to respect the separateness of the corporate entity. We disagree. The record reveals that Country was not a large-scale operation. It is not uncommon for small corporations to operate from one bank account. The record is devoid of any evidence that the Songers commingled personal and corporate funds or used the corporate bank account for personal purposes. To the extent Westside cites Country's payment of a $50,000 salary to Jahn as president of Country, we note that she provided services for the company and that Westside presented no evidence to indicate that her salary was not commensurate with her regular activities as president of the company.

Indiana Code Section 23-1-52-1 requires a corporation to keep and maintain certain records, including appropriate accounting records and minutes of all shareholders' meetings held during the previous three years. Here, Country's bookkeeper Hambright testified via deposition concerning her accounting duties. At trial copies of the minutes from the three most recent annual shareholders' meetings (2007 through 2009) were admitted as Plaintiff's Exhibit 53. Each consists of one page, signed by Jahn Songer as director and president and Stephen Songer as director and vice president. The minutes contain the following identical language describing the matters covered at each meeting:

> A general discussion of the corporation took place and it was recognized by all present that the corporation was making satisfactory progress.
>
> On motion duly made and seconded all officers and directors were re-elected by unanimous vote.
>
> There being no further business the meeting was adjourned.

*Id.*[5] The trial court described the minutes as "meager" and mere "boilerplate." Appellants' App. at 124, 128. Notwithstanding their lack of detail, we find that Westside has failed to establish a causal link between Country's recordkeeping and any injustice resulting from it.

---

[5] Also included in the record is a copy of minutes from Country's January 1, 2007 shareholders' and directors' meeting. The language is nearly identical to the three most recent minutes except for the following:

> On motion duly made and seconded it was decided by unanimous vote that the name of the corporation should change from Country Concrete, Inc. to Country Contractors, Inc., in light of the termination of the concrete business and the entry into the equipment leasing contract business.

Defendant's Ex. D.

Finally, we note that when it pierced the corporate veil, the trial court emphasized that due to Country's bankruptcy, Westside "has no other recourse" except against the Songers. *Id*. at 130. The same could be said for any entity that contracts with a company that ends up in bankruptcy. The record shows that Country was unable to collect from many of its receivables due to its own customers' bankruptcies. Lack of other recourse simply is not a proper basis for piercing the corporate veil, and Westside failed to carry its burden of establishing a causal connection as required by the *Aronson* test. Based on the foregoing, we conclude that the trial court clearly erred in piercing the veil and reverse its judgment as to the Songers. As a result, we resolve all subsequent issues solely with respect to Country.

## II. Slander of Title

Country also challenges the trial court's determination that it slandered Westside's title by filing a lien claim against Westside. Indiana Code Section 32-20-5-1 states, "A person may not use the privilege of filing notices under this article to slander the title to land." To prevail on a slander of title claim, a plaintiff must prove that the defendant made false, malicious statements regarding the plaintiff's ownership of the land in question and that those statements caused the plaintiff to suffer pecuniary loss. *Walsh & Kelly, Inc. v. Int'l Contractors, Inc.*, 943 N.E.2d 394, 398 (Ind. Ct. App. 2011), *trans. denied*. Malicious statements are statements made knowingly or with reckless disregard for their falsity. *Id*. The trier of fact may infer malice from the evidence. *Id*. Numerous cases support the premise that filing a mechanic's lien may amount to slander of title in certain circumstances.

20

In *Lee & Mayfield, Inc. v. Lykowski House Moving Engineers, Inc.*, 489 N.E.2d 603, 609 (Ind. Ct. App. 1986), *trans. denied*, another panel of this Court addressed the issue of whether malice could be established by the filing of a mechanic's lien. There, a machine shop (Lee) that supplied parts for equipment used by a contractor was not within the class of permissible mechanic's lien claimants against the property of a third party (Levy) on which the contractor happened to use the equipment. *Id*. at 608. Lee not only filed a mechanic's lien against Levy's property but also filed an action to foreclose the lien and attempted to block the passage of an ordinance sought by Levy to obtain economic development bond financing, eventually causing the bank to withdraw its offer to purchase Levy's bonds. *Id*. at 609. The *Lee & Mayfield* court affirmed the trial court's finding of malice inferred from conduct. *Id*.

In *Walsh & Kelly*, a subcontractor filed an invalid lien against the owner of property on which it performed work. The lien was invalid because the property owner had already paid the general contractor. The lien's invalidity was not challenged on appeal. The issue on appeal was whether the evidence supported a finding that the lien claimant/subcontractor acted maliciously. 943 N.E.2d at 399. At the time it filed the lien, the lien claimant Walsh was unaware that the property owner had paid its obligation to the general contractor. After the lien was filed, counsel for the property owner repeatedly contacted Walsh, requesting release of the lien. When the lien was not released, the property owner sought and was awarded damages for slander of title. On appeal, another panel of this Court held that while Walsh was unaware and therefore lacked malice when it filed the invalid lien, its refusal to

21

release the lien despite multiple notifications amounted to malice sufficient to support a slander of title finding. *Id.*

A mechanic's lien is purely a statutory creation, and as such, the statutory provisions governing mechanic's liens must be strictly construed. *Capital Drywall Supply, Inc. v. Jai Jagdish, Inc.*, 934 N.E.2d 1193, 1200 (Ind. Ct. App. 2010). A person seeking to acquire a lien must file a "sworn statement" specifying the amount of his claim as well as other information identifying himself, the property owner, and the land. Ind. Code § 32-28-3-3. A contractor or subcontractor may have a lien on the property "to the extent of the value of any labor done or the material furnished." Ind. Code § 32-28-3-1(b). "The filing requirements for a mechanic's lien serve two policy objectives: (1) to provide the record titleholder of the property with notice that a mechanic's lien has been placed upon the real estate; and (2) to put third party purchasers and money lenders on notice of the same fact." *Capital Drywall*, 934 N.E.2d at 1200.

Here, Country paid O&M approximately $116,000 on its first four invoices. On December 17, 2008, O&M sent Country a fifth invoice for approximately $38,000. When Country did not pay the invoice, O&M twice re-sent it. Jahn Songer testified that Country did not pay the fifth invoice on the first and second billings because it never received those earlier billings. Having received no payment on the fifth invoice by February 6, 2009, O&M filed a $38,000 mechanic's lien claim for work it performed on Westside's property. Three and a half months later, on May 27, 2009, Country filed a lien claim against Westside's property for the same amount, based on O&M's fifth invoice which it received on O&M's

22

third billing in March 2009. Plaintiff's Ex. 63. A week before Country filed its May 27 lien claim, O&M's lien was released due to Westside's payment directly to O&M. Plaintiff's Ex. 17.

Country's lien claim was file-stamped by an employee in the county recorder's office, but inexplicably, the lien did not appear in a title search of the property.[6] Country asserts that its act of filing the lien created no cloud on Westside's title because the lien was not viewed by any searchers of the records. We disagree. The statute clearly states that a mechanic's lien is valid when it is properly filed in the county recorder's office. Ind. Code § 32-28-3-1. Its validity is not vitiated by another person's failure to find the lien in the records. *See* *Wilson v. Logue*, 131 Ind. 191, 194, 30 N.E. 1079, 1080 (1892) (lien was valid where lien claimant properly filed his notice of lien claim in county recorder's office even though county recorder recorded lien in the wrong book). Thus, the title company's failure to discover Country's lien in its search does not render it invalid. Country's lien was on file as of the date on the file stamp and clouded Westside's title as of that date.

While Country's lien claim was not procedurally deficient, it was invalid for a different reason: because it was a lien claim against Westside's property for work that

---

[6] Westside was unaware of Country's filing until Country raised it in a counterclaim to Westside's amended complaint in the present action. Indiana Code Section 32-28-3-3(d) states that the recorder shall mail a copy of the notice of intent to hold a lien to the owner of the property. It is unclear from the record why Westside did not receive such notice.

Country did not perform and for an invoice that Country never paid to O&M.[7]  When Country filed its lien claim, both O&M's lien claim and its release of lien based on Westside's direct payment to O&M were on file in the county records.  As such, Country had constructive notice of those entries, and its filing of an invalid lien claim constitutes evidence sufficient to support the trial court's finding that it slandered Westside's title.

### III.  Attorney's Fees

Country also asserts that the trial court clearly erred in awarding attorney's fees to Westside. The general rule in Indiana is that each party to litigation must pay its own attorney's fees. *City of Jeffersonville v. Envtl. Mgmt. Corp.*, 954 N.E.2d 1000, 1013 (Ind. Ct. App. 2011), *trans. denied* (2013).  Notwithstanding, an award of attorney's fees may be authorized by contract, rule, statute, or agreement, and in such cases, the trial court is afforded broad discretion. *Id*. at 1012-13.  We review both the decision to award attorney's fees as well as the amount of the fee, which must be supported by the evidence. *Id*. at 1013. An award of attorney's fees will be reversed only where an abuse of the trial court's discretion is apparent on the face of the record. *Hill v. Davis*, 850 N.E.2d 993, 996 (Ind. Ct. App. 2006).  Here, the award of attorney's fees is statutorily authorized with respect to Westside's slander of title claim.  In an action under Indiana Code Chapter 32-20-5, if the trial court "finds that a person has filed a claim only to slander title to land, the court shall …

---

[7] Although the record is inconclusive concerning the date upon which Country performed its last labor on and/or removed its machinery from Westside's property, there is some evidence to indicate that Country stopped work on the property after December 2008, in which case Country's May 27, 2009 filing of notice of intent to hold a mechanic's lien would be untimely.  *See* Ind. Code § 32-28-3-3(a)(2) (a claimant must file its notice of intent to hold lien not later than ninety days after performing labor or furnishing materials or machinery).

24

award the plaintiff all the costs of the action, including attorney's fees that the court allows to the plaintiff." Ind. Code § 32-20-5-2(1). As previously discussed, we affirm the trial court's conclusion that Country slandered Westside's title. Thus, the trial court properly determined that an attorney's fee award was authorized in this case.

Country challenges the amount of the attorney's fee award, claiming that it was excessive and imprecise, containing fees for time spent on services other than those attributable to the pursuit of Westside's slander of title claim. "In determining the reasonable value of the legal services rendered, the time expended by the attorney alone is not a controlling factor." *Nunn Law Office v. Rosenthal*, 905 N.E.2d 513, 520 (Ind. Ct. App. 2009) (citation and quotation marks omitted). The Indiana Professional Code of Conduct contains a non-exhaustive list of factors providing guidance in determining the reasonableness of attorney's fees. Among the factors are time and labor; novelty and difficulty of the issues; skill required to perform properly; the fee customarily charged in the locality for similar legal services; and whether the fee is fixed or contingent. Ind. Professional Conduct Rule 1.5(a). A trial judge has personal expertise that he or she may use when determining the reasonableness of the fees. *Nunn Law Office*, 905 N.E.2d at 516.

At trial, Westside's counsel testified that he had rendered services in this cause since 2008 and that his hourly rate was $175. Tr. at 121. He noted that the case involved extensive discovery and described the case as "complicated," "fairly difficult," and a case that "was going to take a lot more work than [Westside] could … justify." *Id*. at 122. He explained that the case had grown in such magnitude that he had agreed to convert from an

25

hourly fee to a contingency fee.[8] He recognized the court's "ability to access reasonable legal fees, should it decide to find reasonable legal fees are showing or due and owing because of the court's training and its experience itself" and concluded, "I believe 100 hours over 4 years is a reasonable fee …. the value of my time is $17,500.00." *Id.* The trial court agreed and concluded, "[t]he legal fees of $17,500.00 incurred by Westside are reasonable." Appellants' App. at 129. Appellants' counsel was given the opportunity to cross-examine Westside's counsel concerning his fee testimony but chose not to do so.

From the record, we see a contract dispute that became exceedingly complicated with the insertion of the counterclaim for slander of title. The action extended over a four-year period, and counsel became increasingly concerned about his client's ability to pay the mounting attorney's fees. We defer to the court's broad discretion, recognizing the court's unique expertise and familiarity with the case and with the customary legal fees charged in Hendricks County. As such, we affirm the trial court's award of attorney's fees.

## IV. Delay Damages

Finally, Country contends that the trial court clearly erred in awarding delay damages and in calculating the amount of those damages. The computation of damages is a matter within the trial court's discretion. *Ponziano Constr. Servs. v. Quadri Enters., LLC*, 980

---

[8] We note that no written, signed contingency fee agreement was introduced at trial. *See* Ind. Professional Conduct Rule 1.5(c) (requiring contingency fee agreement to be in writing and signed by client). We also note that, although Indiana Professional Conduct Rule 1.5 lists contingency of the fee as a factor to be considered, a contingency fee agreement between an attorney and his or her client is not controlling in fixing a reasonable attorney's fee to assess against an opposing party. *Venture Enters., Inc. v. Ardsley Distributors, Inc.*, 669 N.E.2d 1029, 1034 (Ind. Ct. App. 1996).

N.E.2d 867, 873 (Ind. Ct. App. 2012). Although mathematical certainty is not required, the amount awarded must be supported by evidence in the record. *Id.* In a breach of contract case, the measure of damages is the loss actually suffered by the breach. *Id*.

In support of its argument that the trial court should not have awarded delay damages at all, Country cites the contract's failure to specify a completion date for performance. "When the parties to an agreement do not fix a date certain for performance, the law implies a reasonable time." *Id*. at 874. "What constitutes a reasonable time depends upon the subject matter of the contract, the circumstances attending the performance of the contract, and the situation of the parties to the contract." *Id*.

With respect to the amount of the damage award, "[a] party's recovery for breach of contract is limited to the loss actually suffered, and the party may not be placed in a better position than he or she would have enjoyed if the breach had not occurred." *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 337 (Ind. Ct. App. 2011). A proper award of lost profits is lost net profits, not lost gross income. *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 251 (Ind. Ct. App. 2010). Otherwise, the aggrieved party would "receive a windfall in the form of that portion of lost gross income representing expenses of operation saved by defendant's breach." *Id*. (citation omitted). *See also Jay Clutter Custom Digging v. English*, 393 N.E.2d 230, 233 (Ind. Ct. App. 1979) (disallowing damage award as speculative where based only on evidence of gross income).

Country asserts that the trial court clearly erred in merely accepting the sum as listed in Westside's proposed findings of fact. The practice of adopting a party's proposed findings

27

verbatim is not prohibited. *Piles v. Gosman*, 851 N.E.2d 1009, 1012 (Ind. Ct. App. 2006). "Although we by no means encourage the wholesale adoption of a party's proposed findings and conclusions, the critical inquiry is whether such findings, as adopted by the court, are clearly erroneous." *Id.*

Here, the trial court did not adopt all of Westside's proposed findings, but in its only finding addressing delay damages, it adopted Westside's proposed $33,920 figure. See Appellants' App. at 123 ("47. Country's abandonment set Westside back about a year. The delay caused Westside damage of approximately $33,920.00."). The dollar figure comes from Westside's Proposed Finding 43, which states,

> Larry Nielsen testifies Country's abandonment set Westside back about a year. *Assuming a hard eight months of delay*—contract had no completion date— Exhibit 19 demonstrates a cash flow for Westside of about $4,240 net profit before tax. (Page one, monthly rent of $15,823, with page two, monthly expense, $11,583, difference being $4,240, *times eight* is $33,920.)

*Id.* at 93 (emphases added).

While the court's adoption of a party's dollar figure does not itself amount to clear error, the figure must enjoy sufficient evidentiary support. In this vein, we first note that although Westside's proposed finding mentions a setback of about one year, its calculation is clearly based on an assumed "hard eight months of delay." *Id.* The trial court did not adopt the eight-month delay but instead adopted a one-year delay. Notwithstanding, the court adopted the dollar figure that was clearly calculated using an eight-month timeframe, as evidenced in the parenthetical calculation contained within Westside's proposed Finding 43. The trial court simply removed the references to eight months and retained the delay duration

28

of one year but retained the dollar figure based on an eight-month duration. Thus, Finding 47 is internally inconsistent.

While the trial court did not indicate why it omitted the proposed eight-month timeframe and adopted a one-year timeframe, we note that the record is devoid of evidence concerning an eight-month timeframe. With respect to the duration of the delay, Nielsen testified that he did not know exactly when Country began its work on the project, but he knew that it ceased working after December 2008. Tr. at 19, 26, 29. At that time, the project was incomplete. Nielsen did not indicate how much longer the project reasonably should have taken to complete. When asked how long the project was supposed to take, he responded, "Until it was completed, I don't know how long it would have taken them." *Id*. at 16. The replacement contractor, Hall, began its work sometime around July 2009, and occupancy of the buildings began in December 2009. *Id*. at 27, 37. When asked how long the project was delayed due to Country's nonpayment to the subcontractors, Nielsen responded, "At least *six months*, probably set us back *a year* …. [Country is responsible for the] delay of at least *six months* as far as the excavating, yes." *Id*. at 40 (emphases added). In short, the trial court adopted a one-year duration figure, which enjoyed some evidentiary support, but it did not adjust the calculation accordingly.

Even if the trial court had properly adjusted the delay damage calculation to cover a six- or twelve-month duration, we find the evidence concerning Westside's actual loss attributable to delay to be speculative. Westside's calculation (adopted by the court) was based on figures contained in Plaintiff's Exhibit 19. Page one of Plaintiff's Exhibit 19

consists of a table listing annual rent projections beginning in November 2007. The table contains numerous sets of figures, based on occupancy percentages of storage units. In addition to the printed figures, there are additional, unexplained figures penciled in on each side of the table. Page two of the exhibit contains a cash flow analysis/progression of revenue for a twelve-month period. Again, the figures appear to be dependent upon the occupancy rate. Also notable is that there is no date listed anywhere on page two; as such, it is impossible to tell whether this page of the exhibit applies to the same time period as page one, i.e., one year beginning November 2007. The record is devoid of any testimony explaining the printed (or penciled) figures contained in the exhibit. At trial, Nielsen was asked his gross income for the first year he was in business. He responded, "I believe 2010 was like $45,000.00 or $44,000.00 [or about $3,500.00 per month]." Tr. at 40. These estimates represent gross rental income, provided in retrospect, rather than projections made in 2007. They obviously differ from the monthly income used in Westside's calculation in its proposed findings. There also is a discrepancy in the number of buildings contained in the projections versus the number actually built. Simply put, the evidence is inconclusive concerning the actual amount of damages suffered due to Country's delay. Based on the foregoing, we conclude that the figure adopted by the trial court is speculative and therefore reverse the trial court's award of $33,920 delay damages. To the extent that our holding on this issue affects the calculation of prejudgment interest, we remand for a recalculation.

Affirmed in part, reversed in part, and remanded.

BARNES, J., and PYLE, J., concur.

30