**COMMUNITY CARE CENTERS, INC., New Horizons Developmental Center, Myron Bradburn and Bonita J. Bradburn, Appellants–Petitioners,**

v.

**John HAMILTON in his capacity as Secretary of Family and Social Services Administration; and Kathleen D. Gifford in her capacity as Director of the Office of Medicaid Policy and Planning, Family and Social Services Administration, Appellees–Respondents.**

No. 18A02–0202–CV–142.

Court of Appeals of Indiana.

Sept. 5, 2002.

560

**562**

William E. Wendling, Jr., Campbell Kyle Proffitt, Carmel, IN, Attorney for Appellants.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Myron and Bonita Bradburn appeal the trial court's grant of summary judgment, which dissolved the corporate identity of Community Care Centers, Inc. (CCCI) and rendered them personally liable for reimbursing funds to the State. Because we find that the trial court improperly pierced CCCI's corporate veil on summary judgment, we reverse.

### Facts and Procedural History

Following changes to the Medicaid reimbursement rules in 1988, which would have had the effect of reducing the value of CCCI's facilities upon transfer, CCCI sought an injunction to prevent the implementation of the new rules. These new transfer provisions were of concern to CCCI because it was being forced to transfer ownership of some of its facilities due to losses accruing as a result of the maximum annual rate increase limitation imposed by the 1984 Medicaid reimbursement rules. The injunction enjoining the implementation of the 1988 rules was granted, thereby allowing CCCI to transfer its facilities without reducing their value. However, CCCI did not wish to transfer all of its facilities and decided to seek an injunction to enjoin the State from using the maximum annual rate increase limitation as the sole determinant in setting Medicaid rates. This injunction was also granted.

The Indiana Supreme Court reversed both the injunction that enjoined the 1988 rules from being implemented and the injunction that enjoined the use of the maximum annual rate increase limiter. *Ind. Bd. of Pub. Welfare v. Tioga Pines Living Ctr., Inc.*, 622 N.E.2d 935 (Ind.1993). Two days after our supreme court handed-down *Tioga Pines*, the Bradburns executed a capital lease agreement that transferred the operations of all of the CCCI facilities to Legacy Healthcare, Inc., which is owned by their son, Douglas Bradburn.

Based on the *Tioga Pines* decision, the Family and Social Services Administration (FSSA) filed an action seeking a refund of Medicaid funds paid to CCCI pursuant to injunctions that reimbursed CCCI at rates greater than the State would have been obligated to pay absent the injunctions. The FSSA initiated its restitution action against both CCCI and its owners, the Bradburns. CCCI answered the complaint, but the Bradburns filed a motion to dismiss the personal claims against them. The FSSA then moved for partial summary judgment seeking entitlement as a matter of law for restitution of the difference between the Medicaid payments received by CCCI under the erroneously issued injunctions and the payments it would have been entitled to receive under Indiana's then-applicable Medicaid payment regulations, which the trial court granted. Additionally, the trial court denied the Bradburns' motion to dismiss and directed that the case would proceed on the remaining issues: (1) the amount of the State's damages; and (2) whether CCCI's corporate shield protected the Bradburns from personal liability for the restitution sought by the State.

Subsequently, the FSSA filed a motion for partial summary judgment on the issue of the amount of restitution, which the trial

court granted and entered a final judgment against CCCI in the amount of $6,302,976.02, plus interest and costs. CCCI appealed the judgment, which we affirmed. *Cmty. Care Ctrs., Inc. v. Sullivan,* 701 N.E.2d 1234 (Ind.Ct.App.1998), *trans. denied.*

The FSSA filed a third motion for summary judgment on the issue of whether the Bradburns were personally liable for payment of the restitution judgment. The trial court granted summary judgment in favor of the FSSA. In granting summary judgment, the trial court found the following facts to be uncontroverted:

a. Throughout the existence of [CCCI], incorporated in 1970, Myron Bradburn has owned sixty (60) percent and his wife Bonita Bradburn has owned the remaining forty (40) percent of the issued stock.

b. Bonita Bradburn, corporate secretary-treasurer, works mainly at home. Myron Bradburn, corporate president, who works an average of twenty (20) hours a week, has no idea what she does besides consulting with him on the litigation, the bills and the banks.

c. In 1995, [CCCI] received $5.9 million lease revenue, from which $2.8 million was paid out in mortgage payments.

d. Testimony indicates that at least in 1994, 1995, and 1996, Myron Bradburn received an annual salary of $600,000 and Bonita Bradburn received an annual salary of $300,000. In 1994 and 1995, four of their children—Lee, Deb, Jon and Amy—received $10–12,000 each annually for assistance in making decisions about litigation, bills, and banks.

e. The annual salaries of Myron Bradburn and Bonita Bradburn were not a reasonably equivalent value for the modest services they performed.

f. Myron Bradburn testified on March 7, 1995, that the cash which flowed from his individual properties and from [CCCI's] properties was jointly used to satisfy debts incurred by both sets of properties. Wherever the payable came from, the creditors all looked to Myron Bradburn in the end.

g. CCCI did not and does not have operating or capital budgets.

Appellant's App. p. 29. From these facts, the trial court concluded:

[T]he corporate fiction should be disregarded with regard to [CCCI] and Myron Bradburn and Bonita Bradburn should not be allowed to evade personal liability for the acts of their corporation, e.g.

1. Myron Bradburn and Bonita Bradburn, as sole stockholders of [CCCI] used said corporation to wrongfully obtain $6,302,976.02 medicaid [sic] funds from Plaintiffs;

2. Two days following the Indiana Supreme Court's vacation of the injunction which had allowed [CCCI] to obtain the overpayment of medicaid [sic] funds, [CCCI] entered into a capital lease with Legacy Healthcare, Inc., which is owned by their son Douglas, a vice-president of [CCCI];

3. In 1994, 1995, and 1996, alone and without looking at other years, through excessive salaries, Myron Bradburn and Bonita Bradburn transferred to themselves $2.7 million from [CCCI] at a time when they knew that the Plaintiffs would be looking to it for restitution;

4. Myron Bradburn has consistently disregarded the corporate form, commingling personal and corporate

funds in payment of corporate and personal obligations.

The glaring injustice which compels the equitable granting of Plaintiffs' motion is that the Defendants Myron Bradburn and Bonita Bradburn, through the manipulation of the corporate form, were the wrongful recipients of $6,302,976.02 in taxpayer-derived Medicaid funds. This is enhanced by the absence herein of corporate bugetary [sic] records, payment by the corporation of individual obligations and vice versa, commingling assets and affairs, together with the transfer of assets by salaries which were on their face fundamentally, unreasonably disparate to any value received.

Appellant's App. p. 30 (citations omitted). This appeal ensued.

## Discussion and Decision

When reviewing a grant of a motion for summary judgment we stand in the shoes of the trial court, and we are not limited to reviewing the trial court's reasons for granting summary judgment. *Strodtman v. Integrity Builders, Inc.*, 668 N.E.2d 279, 281 (Ind.Ct.App.1996), *trans. denied.* We resolve any doubt about a fact or any inference to be drawn from it in favor of the nonmoving party. *Id.* We will affirm the trial court's decision only if no genuine issues of material facts exist and the movant is entitled to judgment as a matter of law. *Id. See also* Ind. Trial Rule 56(C). If we have any doubts concerning the existence of a genuine issue of material fact, we must resolve those doubts in favor of the nonmoving party and reverse the entry of summary judgment. *Soames v. Young Oil Co.*, 732 N.E.2d 1236, 1238 (Ind.Ct. App.2000).

A fact is material for summary judgment purposes if its resolution is decisive of either the action or a relevant secondary issue. *Id.* A factual issue is genuine if those matters properly considered under Indiana Trial Rule 56 evidence a factual dispute requiring the trier of fact to resolve the opposing parties' different versions. *Id.* Finally, we note that summary judgment should not be granted when it is necessary to weigh the evidence. *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 285 (Ind.1991).

Here, the trial court entered specific findings of fact and conclusions thereon, which would normally trigger the two-tiered appellate standard of review contained in Indiana Trial Rule 52. *Ferrell v. Dunescape Beach Club Condos. Phase I, Inc.*, 751 N.E.2d 702, 709 (Ind.Ct.App. 2001) (citing *Campbell v. Spade*, 617 N.E.2d 580, 582 (Ind.Ct.App.1993)). While specific findings and conclusions entered by the trial court when ruling on a motion for summary judgment afford the appellant an opportunity to address the merits of the trial court's rationale and aid our review by providing us with a statement of reasons for the trial court's action, they have no other effect. *Ferrell*, 751 N.E.2d at 709. Thus, rather than relying upon the trial court's findings and conclusions, we must base our decision upon the materials properly presented to the trial court under Indiana Trial Rule 56(C). *Id.*

"As a general rule, Indiana courts are reluctant to disregard corporate identity and do so only to protect third parties from fraud or injustice when transacting business with a corporate entity." *Lambert v. Farmers Bank*, 519 N.E.2d 745, 747 (Ind.Ct.App.1988). When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry. *Smith v. McLeod Distrib. Inc.*, 744 N.E.2d 459, 462 (Ind.Ct.App. 2000). "A party seeking to pierce the corporate veil bears the burden of establishing that the corporation was so ig-

nored, controlled or manipulated that it was merely the instrumentality of another, and that the misuse of the corporate form would constitute a fraud or promote injustice." *Gurnik v. Lee*, 587 N.E.2d 706, 710 (Ind.Ct.App.1992). In deciding whether the party seeking to pierce the corporate veil has met its burden, Indiana courts consider whether the party has presented evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. *Smith*, 744 N.E.2d at 463.

▬ The FSSA fails to direct our attention to any cases where Indiana courts have pierced the corporate veil on summary judgment, nor were we able to find any. This is not surprising in light of the fact that "it is recognized that the determination of whether there are sufficient grounds for piercing the corporate veil ordinarily should not be disposed of by summary judgment, in view of the complex economic questions often involved, especially if fraud is alleged." 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.95 at 700 (Perm. ed.1999). *See also Mustang Tractor & Equip. Co. v. Cornett*, 747 S.W.2d 33, 36 (Tex.App.1988) (finding no case where the corporate sham theory had been established so as to support a summary judgment); *Laya v. Erin Homes*, 177 W.Va. 343, 352 S.E.2d 93, 102 (1986) (opining "It is also clear that the propriety of piercing the corporate veil should rarely be determined upon a motion for summary judgment. Instead, the propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of the facts to determine upon all the evidence.").

In essence, the FSSA is accusing the Bradburns of having used their corporation to commit a fraud upon its agency. This is precisely the type of situation that Professor Fletcher warns is ill suited for disposition on summary judgment. Nonetheless, we will examine the evidence presented by the parties as to each veil-piercing factor and the inferences to be drawn therefrom to determine whether the trial court properly pierced the corporate veil on summary judgment.

### (1) Undercapitalization

▬ " 'Inadequate capitalization' means capitalization very small in relation to the nature of the business of the corporation and the risks attendant to such businesses." Fletcher, *supra*, § 41.33 at 652. The adequacy of capital is to be measured as of the time of a corporation's formation. *Id.* "A corporation that was adequately capitalized when formed, but which subsequently suffers financial reverses is not undercapitalized." *Id.* "On the other hand, if an adequately capitalized corporation later substantially expands the size or nature of the business with an attendant substantial increase in business hazards, the corporation might be deemed inadequately capitalized unless there is an infusion of additional risk capital by shareholders." *Id.* at 652–53. Consequently, while a trial court's examination of the adequacy of capitalization may inquire beyond the capitalization at the inception of the corporation, such inquiry is limited to those circumstances where the corporation distinctly changes the nature or magnitude of its business. *Id.* at 653.

The FSSA claims that CCCI is undercapitalized. Specifically, the FSSA points to the deposition testimony of Myron Brad-

burn in which he explained that CCCI has not paid back the $550,000 loan from Legacy because it has not had the funds. This is the only evidence the FSSA proffers of CCCI's alleged undercapitalization. However, the record discloses that when CCCI was formed in 1970, the stockholders contributed a facility to CCCI that was sold in 1988 for a net gain of $2,818,387. Additionally, the stockholders contributed $1,000,000 of paid-in capital in 1989. The FSSA does not contend, nor provide any evidence to suggest, that CCCI was undercapitalized at its inception or that CCCI changed the nature or magnitude of its business so as to require an additional infusion of capital. Consequently, we conclude that a factual dispute as to whether CCCI was undercapitalized exists.

### (2) Absence of Corporate Records

Under the Indiana Business Corporation Law (IBCL) a corporation must keep as permanent records minutes of all meetings of its shareholders and board of directors, a record of all actions taken by the shareholders or board of directors without a meeting, and a record of all actions taken by a committee of the board of directors in place of the board of directors on behalf of the corporation. Ind. Code § 23–1–52–1(a); *see also* 19 Paul J. Galanti, INDIANA PRACTICE—BUSINESS ORGANIZATIONS § 33.2 at 345–46 (1991) (highlighting the record keeping requirements of Indiana Code § 23–1–52–1). A corporation must also maintain appropriate accounting records. I.C. § 23–1–52–1(b). Additionally, a corporation or its agent must maintain a record of its shareholders, in a form that permits preparation of a list of the names and addresses of all shareholders, in alphabetical order by class of shares showing the number and class of shares held by each. I.C. § 23–1–52–1(c). Finally, a corporation must keep a copy of the following records at its principal office: its articles or restated articles of incorpo-

ration and all amendments to them currently in effect; its bylaws or restated bylaws and all amendments to them currently in effect; resolutions adopted by its board of directors with respect to one or more classes or series of shares and fixing their relative rights, preferences, and limitations, if shares issued pursuant to those resolutions are outstanding; all written communications to shareholders generally within the past three years, including the financial statements furnished for the past three years under Indiana Code § 23–1–53–1; a list of the names and business addresses of its current directors and officers; and its most recent annual report delivered to the secretary of state under Indiana Code § 23–1–53–3. I.C. § 23–1–52–1(e).

The FSSA contends that CCCI's failure to establish and maintain critical corporate records demonstrates further indicia of corporate guise. In particular, the FSSA notes that CCCI did not maintain operating or capital budgets even though outside accountants warned that failure to do so would make it difficult to know whether management statements about CCCI's financial condition are accurate. Although it may not be sound business practice to operate without operating or capital budgets, the FSSA does not make a showing that budgets are required corporate records under the IBCL. While the IBCL generally requires that a corporation maintain appropriate accounting records, there is no indication of what constitutes "appropriate accounting records." The Bradburns assert that CCCI has maintained all required records under the IBCL. In particular, the Bradburns contest that CCCI violated the record keeping requirement in light of the fact that CCCI has maintained accounting records in which it records, among other things, payments made by CCCI to its owners and payments by its

owners to CCCI. Thus, we find there is a factual dispute regarding whether the Bradburns maintained appropriate accounting records.

### (3) Fraudulent Representation by Corporation Shareholders or Directors

The FSSA does not allege any fraudulent representations by CCCI shareholders or directors. Therefore, we do not consider this veil-piercing factor.

### (4) Use of the Corporation to Promote Fraud, Injustice or Illegal Activities

■ The FSSA claims that the Bradburns used the corporation to wrongfully obtain funds from the State. More specifically, the FSSA contends,

> [T]he glaring injustice which warranted imposing personal liability on the Bradburns was the fact that [CCCI] (and the Bradburns as sole owners) were the windfall recipients of approximately $6.3 million of taxpayer-derived Medicaid funds and the fact that the Bradburns took steps that removed substantial funds and assets from [CCCI] so that [CCCI] was not in a financial position to repay the public funds owed to the FSSA/State resulting from the wrongful injunctions. Summary Judgment, App. 28–30

Appellee's Br. p. 11. The FSSA accuses the Bradburns of overcompensating themselves in an effort to purposefully siphon funds from CCCI. While it is undisputed that Myron Bradburn collected a salary of $600,000 per year and Bonita Bradburn collected a salary of $300,000 per year between 1994 and 1996, the record fails to disclose that these sums were unreasonable within the long-term care industry given the magnitude of CCCI's operations. Without information about what the norm is for the industry, conflicting inferences could be drawn as to whether these undis-

puted salaries were excessive. Moreover, the only evidence we have of the Bradburns' salaries is for the years 1994–1996. We do not know what their salaries were prior to the injunctions being overturned in October of 1993. Therefore, we are unable to determine from the record before us whether the Bradburns increased their salaries in an effort to siphon funds from CCCI after the injunctions were overturned on appeal.

Further, we note that the Bradburns should not be penalized for CCCI's resort to the judicial system in an effort to enjoin what it believed to be the imposition of unfair rate limiters and transfer provisions which would have reduced the value of the facilities upon transfer without evidence that the motivation in seeking the injunctions was to fleece the State. The trial court's order on summary judgment suggests that CCCI sought the injunctions as a means of cheating the State. However, CCCI contends that the injunctions were sought in order to prevent CCCI from having to sell off its facilities and to help the corporation to remain profitable.

Finally, we take issue with the trial court's conclusion that the Bradburns, "through the manipulation of the corporate form, were the wrongful recipients of $6,302,976.02 in taxpayer-derived Medicaid funds." Appellant's App. p. 30. While admittedly, if true, this would support a decision to pierce the corporate veil, the record is insufficient to show that the Bradburns personally received over six million dollars in Medicaid funds. Moreover, the Bradburns disputed this fact by attesting that the money was used to provide patient care pursuant to the provider agreements under which the payments were received. Accordingly, we find that there are conflicting inferences here as to whether the Bradburns intended to perpetrate a fraud upon the FSSA.

### (5) Payment by the Corporation of Individual Obligations

■ The FSSA also asserts that CCCI paid some of the Bradburns' individual obligations. In particular, the FSSA notes the following examples of the Bradburns using corporate assets for their own private purposes:[1]

[CCCI] supplies Myron Bradburn with a car for personal use even though he does not go into the office on a daily basis[;]. . . .

Trucks and vehicles which are assets of [CCCI], are used by Myron to do lawn work at his residence[;]. . . .

Myron Bradburn carries a credit card used for personal expenses that is billed to [CCCI;]. . . .

. . . .

[CCCI] has also extended millions of dollars in loans to Myron and Bonita Bradburn[;]. . . .

Despite the fact that there is very little work to be done for [CCCI], Myron Bradburn keeps four of his children on the payroll and pays each a salary of between \$10,000 to \$12,000 per year[;]. . . .

None of the children have any clear responsibilities or obligations to the corporation; . . . and

[CCCI] also provides extensive nursing care to a fifth Bradburn child who was disabled in an automobile accident. . . .

Appellant's App. p. 39–40 (citations omitted).

In response to the FSSA's allegations that CCCI paid the Bradburns' personal obligations, the Bradburns presented a verified affidavit of a certified public accountant (CPA). The CPA relied on CCCI's financial statements and workpa-

pers furnished by CCCI's outside auditors in arriving at his conclusions as to the propriety of the Bradburns' financial transactions. The CPA concluded:

It is typical in closely owned businesses of this type for a company, as a matter of convenience, to provide relatively small miscellaneous services for its stockholders and charge the stockholders for those services. . . . In this Corporation's case, such miscellaneous services provided to stockholder are recorded and charged to the stockholders.

Appellant's App. p. 264–65, 270. Thus, while the Bradburns do not dispute that some individual obligations were paid by CCCI, they do offer evidence that the services and money provided to them were recorded and charged to them as stockholders of CCCI. In essence, the Bradburns reimbursed the corporation. Furthermore, the CPA concluded that "[f]or a closely held enterprise of this size, \$765,106 over a six year period (about \$127,500 per year) is a relatively modest net capital flow between the corporation and stockholder which would not be considered unreasonable or excessive." Appellant's App. p. 268. The CPA also attested,

It is also typical for all types of family-owned or controlled businesses (both large and small) to employ family members in the operation. . . . The fact that family members work in a business operation controlled by that family does not constitute a commingling of assets or business affairs between the family stockholders and the company.

Appellant's App. p. 267. While the FSSA urges us to discount this information as

---

**1.** We note that some of these examples seem to fit more naturally in a discussion of commingling of assets. However, because the FSSA included them in its discussion of payment by the corporation of individual obligations, we address them in this section.

self-serving, it fails to conclusively establish that such practices are atypical of family-owned or controlled businesses. Because the Bradburns claim that they effectively reimbursed CCCI for any payment of their individual obligations and that many actions that the FSSA cites as justification for piercing the CCCI's corporate veil are typical of family run corporations, conflicting inferences exist regarding whether the Bradburns' actions support a decision to pierce the corporate veil.

Additionally, we note that the record before us is insufficient to allow us to make a determination concerning the propriety of the loans between CCCI and the Bradburns. Our review of the record reveals that a number of loans were extended by CCCI to the Bradburns. There is evidence in the record that the Bradburns extended loans to the corporation as well. The legitimacy of these loans is difficult to discern from the record before us. Moreover, we are unable to determine whether the loans have been paid back or are still outstanding. Thus, conflicting inferences can be drawn as to the propriety of these loans.

### (6) Commingling of Assets and Affairs

▉▉▉▉▉ "In order to be recognized as an entity separate from its shareholders, a corporation should be operated as a distinct and separate business and financial unit, with its own books, records, and bank accounts." Fletcher, *supra*, § 41.50 at 677. "Evidence that shareholders used corporate funds for personal purposes, mixed corporate and personal accounts, or commingled assets so that the ownership interests were indistinguishable will be weighed, along with other factors, when a disregard of corporate separateness is urged." *Id.* at 677–78.

The FSSA argues that the Bradburns commingled the affairs of CCCI facilities with those of the facilities they operated as sole proprietorships. The FSSA directs

our attention to the deposition testimony of Myron Bradburn in which he stated "wherever [a payable] comes from, they all look to me at the end." Appellant's App. p. 40. The FSSA interprets this to mean, "Entities doing business with either [CCCI] or with Myron Bradburn's individually-owned facilities may look to a common pool of money for payment of their bills." Appellant's App. p. 40. While Myron Bradburn made his characterization in the midst of a deposition, the CPA, after reviewing CCCI's accounting records, attested that CCCI and the Bradburns do not share any financial accounts or hold any assets in common. We find that a factual dispute exists concerning whether commingling sufficient to justify piercing the corporate veil occurred.

### (7) Failure to Observe Required Corporate Formalities

▉▉▉▉▉ "In order to avoid the potential for a court to pierce the corporate veil, a corporation must observe corporate formalities." Fletcher, *supra*, § 41.31 at 635. "Failure to observe corporate formalities includes such activities as commencement of business without the issuance of shares, lack of shareholders' or directors' meetings, lack of signing of consents, and the making of decisions by shareholders as if they were partners." *Id.* at 635–36.

In support of its contention that CCCI failed to observe required corporate formalities, the FSSA points to the casual manner in which the capital lease agreement for the CCCI facilities was entered into by Myron and Douglas Bradburn. The FSSA suggests that this transaction should have been accomplished by a shareholders' or directors' meeting. Myron Bradburn admits that the initial lease deal was the product of a "back of the envelope" negotiation process. Appellant's App. p. 107. However, the Bradburns claim that CCCI adhered to corporate formalities such as issuing shares, electing a

board of directors, and holding shareholders' and directors' meetings. The FSSA does not contest this claim. Consequently, we are not convinced that the informal transfer of CCCI's operations alone is enough to support a decision to pierce the CCCI's corporate veil. Thus, we find that conflicting inferences exist as to whether corporate formalities were ignored so as to allow CCCI's corporate veil to be pierced.

### (8) Other Shareholder Acts or Conduct Ignoring, Controlling, or Manipulating the Corporate Form

The FSSA does not proffer any evidence of other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. Thus, we do not consider this veil-piercing factor.

### Conclusion

While it may be that CCCI's corporate veil should be pierced, it should not have been pierced on summary judgment. Piercing the corporate veil should only be accomplished on summary judgment in extraordinary circumstances such as when it is patently obvious that the sole purpose for a corporation's existence is to perpetrate a fraud or injustice. Because the record before us is inconclusive as to whether CCCI was merely a sham corporation in existence to allow the Bradburns to exploit third parties, we conclude that the trial court erred by piercing CCCI's corporate veil on summary judgment. Consequently, we remand for further proceedings to determine whether CCCI's corporate veil should be pierced and liability imposed upon the Bradburns.

Judgment reversed and remanded for further proceedings.

RILEY, J., and MATTINGLY–MAY, J., concur.