



FILED

Jul 29 2025, 9:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Antwan White, Mika McBaine, Mikeal McBaine, Sheree Fairrow, and Robert Wilson,

*Appellants-Plaintiffs*

v.

American Legion Post #354, Inc., The American Legion-Indiana Branch, The American Legion, Inc., American Legion Auxiliary, American Legion Auxiliary Department of Indiana, Inc., and Keymo Johnson,

*Appellees-Defendants*

---

July 29, 2025

Court of Appeals Case No.
24A-CT-1043

Appeal from the Vanderburgh Superior Court

The Honorable Mary Margaret Lloyd, Judge

Trial Court Cause No.
82D05-2109-CT-4699

**Foley, Judge.**

[1] Antwan White, Mika McBaine, Mikeal McBaine, and Sheree Fairrow (collectively, "the Plaintiffs")[1] appeal from the trial court's order granting summary judgment to The American Legion, Inc. ("ALI"), The American Legion-Indiana Branch ("the Indiana Branch"), American Legion Auxiliary ("ALA"), and American Legion Auxiliary Department of Indiana, Inc. ("ALA-Indiana") (collectively, "the Legion Defendants")[2] on the Plaintiffs' claims of negligence, dram shop, and maintaining an unreasonably dangerous business activity or nuisance. On appeal, the Plaintiffs raise the following restated issues for our review:

> I. Whether the trial court erred in granting summary judgment in favor of the Legion Defendants because there was a genuine issue of material fact as to whether ALI and the Indiana Branch could be held vicariously liable for the wrongdoing of American Legion Post #354 ("Post #354"); and

---

[1] Robert Wilson, who was a plaintiff in the complaint, is a party to this appeal pursuant to Indiana Appellate Rule 17(A); however, he did not join the brief filed by the rest of the Legion Defendants and did not file a separate brief.

[2] American Legion Post #354 and Keymo Johnson were also named as Defendants in the complaint; however, they were not part of the summary judgment order and do not participate in this appeal.

> II. Whether the trial court erred in granting summary judgment in favor of the Legion Defendants because there was a genuine issue of material fact as to whether the Legion Defendants could be held liable by piercing the corporate veil.

Finding no error, we affirm the trial court's summary judgment order.

## Facts and Procedural History

## I. Structure of Plaintiffs

ALI is a national, patriotic veterans' organization chartered under federal law by Congress in 1919 and is statutorily endowed with perpetual existence. ALI was created to serve multiple purposes, including "to cement the ties and comradeship born of service" and "consecrate the efforts of its members to mutual helpfulness and service to their country." 36 U.S.C. § 21702(4)–(5). As part of its federal charter, ALI may establish state and local chapter or post organizations. ALI has almost two million members spanning more than 13,000 local posts, with fifty-five departments across all fifty states, as well as the District of Columbia, Puerto Rico, France, Mexico, and the Philippines. The individual local posts and the departments have their own governing documents that are separate and apart from ALI. While Congress allowed ALI to establish state and territorial organizations and local chapter or post organizations and to provide "guidance and leadership to organizations and local chapters," ALI "may not control or otherwise influence the specific activities and conduct of such organizations and local chapters." 36 U.S.C. § 21704(4)–(5). However, under ALI's constitution, it has the power and

authority to "cancel, suspend[,] or revoke the charter of a [*d*]*epartment* for any good and sufficient cause[.]" Appellants' App. Vol. 3 p. 218 (emphasis added). In the event of a suspension of a department, ALI is "authorized, empowered[,] and directed, by and through its duly authorized agents, to take possession, custody[,] and control of all the records, property[,] and assets of and belonging to such [*d*]*epartment*, and to provide for the government and administration of such [*d*]*epartment* during said suspension." *Id*. at 219 (emphasis added).

[4]     ALI is not involved in the day-to-day operations of individual departments and posts. ALI does not own the land or any fixtures where individual posts are located. ALI does not have any role or knowledge about individual posts' security, policing, and monitoring duties, and all licenses, policies, training, and procedures related to the serving of alcohol are the responsibility of each individual post.

[5]     The Indiana Branch is an Indiana non-profit corporation that, while affiliated with ALI, is a separate and distinct legal entity. The Indiana Branch is one of the fifty-five departments of ALI and serves administrative and programmatic functions for the local posts located in Indiana, maintaining different functions from those of individual local posts. Some of these functions include promoting nationwide American Legion programs, like baseball and an oratorical contest, and promoting the American Legion ideals, known as the four pillars, which consist of Americanism, Veterans Administration, National Security, and Children and Youth. The Indiana Branch also keeps a list of each local post's membership and receives membership dues from the posts.

[6] An application to establish a local post must be made to the Commander of the Department in which the local post members reside. A temporary charter for the local post is issued by ALI after approval from both the department and ALI. While the temporary charter is in place, ALI mandates that the local post "shall conform to and abide by the regulations and decisions of the [d]epartment and of the National Executive Committee, or other duly constituted national governing body of [ALI]." *Id*. at 22. Before a local post's charter becomes permanent, the applicable department may "prescribe the Constitution of its Posts." *Id*. at 23. The permanent charters of the local posts may be "suspended, cancelled[,] or revoked" by the applicable state-level department. *Id*.

[7] The Indiana Branch and local posts maintain separate governing documents, corporate records, and bank accounts, and conduct their own business transactions. The Indiana Branch does not pay the obligations of individual local posts, and the Indiana Branch maintains its own funds, assets, and properties, separate from any funds, assets, and properties that may be maintained by and for any individual local post. The Indiana Branch does not control or otherwise influence the specific activities and conduct of individual local posts. The Indiana Branch is not involved in the day-to-day operations of individual local posts and does not exercise direct oversight and control of the members of individual local posts. The Indiana Branch does not share any common principal officers, directors, or employees with any individual local post and has no employees that work on the premises of any local post. All

security, policing, and monitoring duties are the responsibility of each individual local post, and the Indiana Branch has no control, role, or knowledge over these duties with respect to individual local posts. Many posts do not serve alcohol, but of those that do serve alcohol, each local post is independently responsible for all its licenses, policies, training, procedures, and duties relating to service of alcohol, and the Indiana Branch has no information or control over these matters as to any local post.

[8] ALI recognizes an auxiliary organization, ALA, and membership in ALA is generally limited to women with a close family relationship to members of ALI. ALA is organized into divisions and departments, and the departments are organized into local units. ALA is governed in each department by the rules and regulations that are prescribed by ALI and approved by the applicable department. Under the Standing Rules for ALA, a local post has no authority to regulate a local unit of ALA, and the local unit has no authority to regulate the local post. ALA is not involved in the day-to-day operations of its local units and does not have any control or ability to control local units of ALI. All security, policing, and monitoring duties are the responsibility of each individual local post, and ALA does not have any information or control over these matters regarding local posts. All licenses, policies, training, procedures, and duties related to the serving of alcohol are the responsibility of each individual post, and ALA does not have any information or control over those matters regarding local posts.

[9] ALA-Indiana is the department of ALA for Indiana and, in 2019, had approximately 285 local units with each local unit having its own governance. Local units operate under their own constitution and bylaws, and in 2019, there was a local unit, identified as ALA Unit #354, that was active in the same district as Post #354. That local unit had its own constitution and bylaws, and ALA-Indiana was not involved in the day-to-day operations of the local unit and was prohibited from operational involvement under the ALA constitution and bylaws. The security, policing, and monitoring of the premises of Post #354 are the responsibility of Post #354, and ALA-Indiana did not have any control over these matters at the premises of the local post. All licenses, training, procedures, and duties relating to the serving of alcohol are the responsibility of each individual post, and ALA-Indiana does not exercise any control over these matters at local posts.

[10] ALA-Indiana does not advertise or otherwise hold itself out as being involved in and responsible for the day-to-day operations of individual units or posts. ALA-Indiana also does not advertise or otherwise hold itself out as being in control or otherwise involved in the specific activities of its individual units or posts. ALA-Indiana does not receive financial benefit from the sale or service of alcohol or food at the local posts. The only monies that ALA-Indiana receives from local units are membership dues.

## II.   Underlying Events

[11] Shortly after midnight on October 5, 2019, Antwan White ("White") was exiting the building of Post #354 when he was shot in the parking lot of the

premises. Prior to the shooting, White was patronizing the premises of Post #354 for "leisurely purposes" and "occupied the status of an invitee." Appellants' App. Vol. 2 p. 210. As White was walking in the parking lot, there was a fight going on between unknown individuals, and while White was walking through the parking lot, he was shot. After White was shot, his friends and family rushed him to the emergency room, and White survived the shooting.

[12] The next night, on October 6, 2019, Mika McBaine, Mikeal McBaine (together, "the McBaines"), and Sheree Fairrow ("Fairrow") were at Post #354. Around 3:00 a.m. on that date, someone from Post #354 told Keymo Johnson ("Johnson") to leave the premises of Post #354. Shortly thereafter, the McBaines and Fairrow exited the building on the premises of Post #354. When they exited the building, Johnson was on the premises of Post #354 with a gun and began shooting. The McBaines and Fairrow were all injured by the shooting.

[13] On September 28, 2021, the Plaintiffs filed a complaint against Post #354, Johnson, and the Legion Defendants, asserting claims of negligence, dram shop, and maintaining an unreasonably dangerous business activity or nuisance against the Legion Defendants. The Legion Defendants each individually filed motions for summary judgment contending that they did not control or have the ability to control the premises where Post #354 is located or any aspect of Post #354's activities. The Legion Defendants also filed briefs in support of their motions and designated evidence. The Plaintiffs filed responses to the

motions for summary judgment and designated evidence asserting that there existed a genuine issue of material fact that the Legion Defendants may be directly or vicariously liable for the tortious actions of Post #354 and may be liable under the theory of enterprise liability. A hearing was held on the motions for summary judgment, and the trial court subsequently granted summary judgment to each of the Legion Defendants, concluding that there was no genuine issue as to any material fact and that the Legion Defendants were entitled to judgment as a matter of law. The Plaintiffs now appeal.

## Discussion and Decision

[14] The Plaintiffs argue that the trial court erred when it granted summary judgment in favor of the Legion Defendants because they claim that there exists a genuine issue of material fact both that the Legion Defendants are vicariously liable and that the Legion Defendants can be held liable by piercing the corporate veil. "We review the trial court's summary judgment decision de novo." *Z.D. v. Cmty. Health Network, Inc.*, 217 N.E.3d 527, 531 (Ind. 2023). A party is entitled to summary judgment "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). "A genuine issue of material fact exists when there is 'contrary evidence showing differing accounts of the truth,' or when 'conflicting reasonable inferences' may be drawn from the parties' consistent accounts and resolution of that conflict will affect the outcome of a claim." *Z.D.*, 217 N.E.3d at 532 (quoting *Wilkes v. Celadon Grp., Inc.*, 177 N.E.3d 786, 789 (Ind. 2021)). On appeal, we view

summary judgment "through the same lens as the trial court, . . . constru[ing] all designated evidence and reasonable inferences therefrom in favor of the non-moving party." *Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 912 (Ind. 2017). Moreover, although "[t]he party appealing the trial court's summary judgment determination bears the burden of persuading us the ruling was erroneous," *id.* at 913, "we carefully scrutinize that determination" to ensure that no party was "improperly prevented from having [their] day in court." *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 908 (Ind. 2001). Further, "[i]f there is any doubt, the motion should be resolved in favor of the party opposing the motion." *Mullin v. Municipal City of S. Bend*, 639 N.E.2d 278, 281 (Ind. 1994).

## I.    Vicarious Liability

The Plaintiffs argue that the trial court erred in granting summary judgment in favor of the Legion Defendants because genuine issues of material facts existed as to whether the Legion Defendants can be held vicariously liable. "Vicarious liability is 'a legal fiction by which a court can hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship to the wrongdoer.'" *Yost v. Wabash College*, 3 N.E.3d 509, 518 (Ind. 2014) (quoting *Sword v. NKC Hosps., Inc.,* 714 N.E.2d 142, 147 (Ind. 1999)). This doctrine of imputed liability is frequently discussed within the context of an employer-employee relationship, with the terms employer and employee referencing the principal-agent relationship of agency law. *Id*. "Agency is the fiduciary relationship that arises when one

person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). Thus, under the doctrine of vicarious liability, a principal, "who is not liable because of his own acts, can be held liable 'for the wrongful acts of his [agent] which are committed within the scope of [the agency relationship]." *Yost*, 3 N.E.3d at 518. "Two traditional rationales underlying the doctrine are "that the [principal] is properly held accountable, first, because the [agent] acts upon an implied command from his master and, second, because the master is presumed to exercise control over the behavior of his servant." *Id.* at 519 (citations omitted). The principal may thus be held vicariously liable for the wrongful acts of the agent committed within the scope of the agency relationship and on the principal's behalf. *Id.*

[16] The Plaintiffs argue that genuine issues of material facts exist as to whether ALI and the Indiana Branch could be vicariously liable for the conduct of Post #354, and therefore, summary judgment was not proper.[3] The Plaintiffs contend that both ALI and the Indiana Branch had the authority to exercise control over Post #354's operation of a bar and security, and at a minimum, ALI had the ability to "take over" the Indiana Branch and "shut down" Post #354 and that the Indiana Branch "could have controlled Post #354 without

---

[3] We note that the Plaintiffs only direct this argument regarding vicarious liability to ALI and the Indiana Branch and do not challenge summary judgment entered in favor of ALA and ALA-Indiana on the basis of possible vicarious liability.

ALI's intervention." Appellants' Br. p. 20. ALI and the Indiana Branch assert that the trial court properly granted summary judgment because the designated evidence established that they did not have the right to control the conduct and operation of Post #354, specifically in the area of the serving of alcohol and security.

[17] The Indiana Supreme Court has discussed the degree of control necessary to establish a principal-agent relationship. In *Smith v. Delta Tau Delta*, 9 N.E.3d 154 (Ind. 2014), a fraternity pledge at Wabash College died from acute alcohol ingestion, and the pledge's parents brought a wrongful death suit in relevant part against the fraternity's national organization, asserting that the local chapter of the fraternity was an agent of the national fraternity. The national fraternity moved for summary judgment on the grounds that it did not exercise the necessary control over the local chapter with respect to pledges to establish an agency relationship. Our Supreme Court agreed with the national fraternity, noting that the "'right to control' does not require the [principal] actually exercising control over the actions of the agent, but merely having the right to do so." *Id*. at 164 (quotation marks omitted). The Court then explained that, although the plaintiffs contended that the designated facts showed that the national fraternity, through its broad enforcement powers, had the right to control local fraternity pledge activities and alcohol use, it was significant that the alleged enforcement powers were remedial only. *Id*. The national fraternity had the right to discipline, suspend, or revoke its affiliation with the local fraternity, but the local fraternity's everyday management and supervision of

activities was not under the direction and control of the national fraternity. *Id*. The relationship between the national fraternity and the local fraternity merely involved the national fraternity "offering informational resources, organizational guidance, common traditions, and its brand to the local fraternity" as well as furthering "joint aspirational goals by encouraging individual members' good behavior and by investigating complaints and reports that affect the health, reputation, and stability of local chapters." *Id*. Based on the undisputed evidentiary material, the Court concluded as a matter of law that an agency relationship did not exist between the national fraternity and the local fraternity or its members, and the national fraternity was not subject to vicarious liability for the actions of the local fraternity, its officers, or its members. *Id*. at 164–65. The Supreme Court's holding in *Smith* applies here and is dispositive of the parties' arguments regarding whether ALI and the Indiana Branch could be vicariously liable for the conduct of Post #354.

[18] The designated evidence presented by ALI reflects that ALI was created by Congress, and while Congress allowed ALI to establish state and territorial organizations and local chapter or post organizations and to provide "guidance and leadership to organizations and local chapters," the statutory framework directs that ALI "may not control or otherwise influence the specific activities and conduct of such organizations and local chapters." 36 U.S.C. § 21704(4)–(5). Instead, the individual local posts and the departments have their own governing documents that are separate and apart from ALI, and therefore, the local posts, including Post #354, "operate under their own constitutions and

bylaws." Appellants' App. Vol. 2 p. 222. Under ALI's constitution, it has the power and authority to "cancel, suspend[,] or revoke the charter of a [d]epartment for any good and sufficient cause," and if a department is suspended, ALI is "authorized, empowered[,] and directed, by and through its duly authorized agents, to take possession, custody[,] and control of all the records, property[,] and assets of and belonging to such [d]epartment, and to provide for the government and administration of such [d]epartment during said suspension." Appellants' App. Vol 3 pp. 218–19. Although ALI held the power to suspend departments, the designated evidence established that ALI did not have the ability or right to control the day-to-day operations of Post #354, including the service of alcohol and security. Instead, the designated evidence reveals that any formal authority to control local posts such as Post #354 was merely remedial, just as the national fraternity in *Smith*. Furthermore, there was no designated evidence that ALI actually exercised any control over the operational activities of Post #354.

[19] The designated evidence presented by the Indiana Branch demonstrated that, although departments, like the Indiana Branch, had the ability to suspend, cancel, or revoke a local post's charter, the Indiana Branch "does not control or otherwise influence . . . the specific activities and conduct" of local posts like Post #354 and is not involved in the day-to-day operations of local posts. Appellants' App. Vol. 8 p. 21. Again, as in *Smith*, the Indiana Branch's ability to control Post #354 was remedial only. Additionally, the Indiana Branch's designated evidence established that the Indiana Branch did not exercise control

over security duties or the policies for serving alcohol at the local posts, including Post #354. *Id*. at 21–22.

[20] The Plaintiffs argue that ALI and the Indiana Branch had the ability to control how Post #354 operated its activities by mandating rules that regulate how posts serve alcohol and how posts police their premises. In support, the Plaintiffs refer to designated evidence consisting of affidavits of Sheree Fairrow, Perry Fairrow, and Robert Wilson. These affidavits contained statements by the affiants that are not actual facts based on personal knowledge, and instead, are couched in terms as "[i]t is my understanding" or "I believe." *See* Appellants' App. Vol. 8 pp. 45–52. Such statements are alleged to be facts about the relationship between ALI and the Indiana Branch and Post #354, but none of these statements are objective facts that are reasonably ascertainable, nor are they sufficient to create genuine issues of material fact to prevent or reverse entry of summary judgment. *See Akin v. Simons*, 180 N.E.3d 366, 377 (Ind. Ct. App. 2021) (a party may express an opinion based on his belief or understanding, "but a person's belief or understanding is not an objective fact, and objective facts are required to create genuine issues of material fact" sufficient to reverse entry of summary judgment). The Plaintiffs also designated the constitutions and by-laws of ALI and the Indiana Branch. However, these documents merely establish that ALI and the Indiana Branch have remedial powers to suspend, cancel, or revoke charters of departments and local posts but not that they have the authority or control to dictate policies for the everyday operation of the local posts.

The designated evidence reveals that the relationship between ALI and the Indiana Branch and Post #354 involves ALI establishing departments and local post organizations and ALI being able to suspend or revoke the charter of departments, while the Indiana Branch maintains the ability to suspend or revoke the charter of local posts. Besides this retention of the right to suspend or revoke the charters of departments and local posts, there is no evidence that the actual management and control over the day-to-day operations of local posts, and Post #354 specifically, is a responsibility exercised by ALI or the Indiana Branch over the local posts. The conduct of the local posts in the everyday management and supervision of the activities of themselves, including the security employed and the policies governing the service of alcohol, is not undertaken by ALI and the Indiana Branch. We, therefore, conclude that there was no genuine issue of fact tending to show the existence of an agency relationship, and thus the actions of Post #354 cannot, as a matter of law, be imputed to ALI and the Indiana Branch under a theory of vicarious liability.

## II. Piercing the Corporate Veil

[22] The Plaintiffs also argue that the trial court erred in granting summary judgment in favor of the Legion Defendants because a genuine issue of material fact existed as to whether the Legion Defendants may be held liable for the conduct of Post #354 by piercing the corporate veil. As a general rule, a corporation is not liable for the acts of related corporations. *Blackwell v. Superior Safe Rooms LLC*, 174 N.E.3d 1082, 1092 (Ind. Ct. App. 2021), *trans. denied*. However, courts may invoke the equitable doctrine of piercing the corporate

veil in order to protect innocent third parties from fraud or injustice. *Id*. When a corporation is functioning as an alter ego or a mere instrumentality of an individual or another corporation, it may be appropriate to disregard the corporate form and pierce the veil. *Id*. Whether it is appropriate to pierce the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be highly fact-driven. *Reed v. Reid*, 980 N.E.2d 277, 301 (Ind. 2012); *See also Cmty. Care Ctrs., Inc. v. Hamilton,* 774 N.E.2d 559, 570 (Ind. Ct. App. 2002) (recognizing that "piercing the corporate veil should only be accomplished on summary judgment in extraordinary circumstances"), *trans. denied.* "'[T]he burden is on the party seeking to pierce the corporate veil to prove that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice.'" *Reed*, 980 N.E.2d at 301. (quoting *Aronson v. Price,* 644 N.E.2d 864, 867 (Ind. 1994)).

[23] The corporate veil may be pierced "only after careful review of the entire relationship between the corporations." *Eden United, Inc. v. Short*, 573 N.E.2d 920, 932 (Ind. Ct. App. 1991), *trans. denied*. "[T]he key factor in any decision to disregard the corporate status of a tortfeasor is the element of control or influence exercised by the entity sought to be held liable for the corporation's affairs." *Id*. Generally, the circumstances must show "control by the parent to such a degree that the subsidiary has become its mere instrumentality[.]" *Id*. Additionally, there must also be (1) evidence of the perpetration of a fraud or wrong by the parent through its subsidiary (such as the violation of a legal

duty), and (2) unjust loss or injury to the claimant caused by misuse of the corporate form (such as avoidance of damages because of insolvency of the subsidiary). *Id.*

[24] The Plaintiffs contend that there is a factual dispute as to whether the American Legion Organization, encompassing all of the Legion Defendants, was manipulated or controlled as one enterprise through their interrelationship to cause illegality, fraud, or injustice or to permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. The Plaintiffs argue that the Legion Defendants are so closely connected that the Plaintiffs should be able to sue each Appellee for the actions of Post #354. The Legion Defendants respond that all of the Legion Defendants are separate entities from Post #354 and that the Legion Defendants exercised minimal control over Post #354. The Legion Defendants further assert that there is no evidence that they used Post #354 to perpetuate fraud or wrongdoing or misused the corporate form in order in a way that caused unjust loss or injury to the Plaintiffs.

[25] Here, the designated evidence established that the Legion Defendants are separate legal entities from each other and from Post #354 and that each Appellee has a separate and unique name, maintains separate offices and telephone numbers, and does not intermingle their business transactions, functions, employees, funds, or records. The Legion Defendants do not own the premises where Post #354 is located, and the Legion Defendants have separate governance from Post #354. As discussed above, the Legion

Defendants do not exercise control over Post #354's day-to-day operations, and the record is devoid of any evidence of the intermingling of operations between the entities. While the Legion Defendants and Post #354 share the ideals of the American Legion set of organizations, their business purposes are completely different. Post #354 is a single local post, and its operations concern only its own individual activities, programs, and membership, while ALI's operations concern programs on the national level, the Indiana Branch's operations are focused on activities and programs on the state level, and ALA and ALA-Indiana are patriotic auxiliary organizations open to female relatives of members of the American Legion that support the mission and activities of ALI. Beyond the shared ideals and the ability of ALI and the Indiana Branch to revoke charters as a remedial measure, the record is devoid of evidence that the trial court could rely upon to support a reasonable inference that the Legion Defendants controlled Post #354 to such a degree that Post #354 became its mere instrumentality.

[26] In response to the Legion Defendants' designated evidence, the Plaintiffs point to deposition testimony of Mark Seavey ("Seavey"), who was the National Judge Advocate for ALI at the time, to assert that the testimony demonstrates that the national, state, and post American Legion entities "share the name and identify as The American Legion," and that the "business purposes" of the entities are similar because each level is "doing the work of The American Legion." Appellants' Br. p. 23. However, Seavey's testimony reveals that when he referred to the "American Legion," he meant the organization as a

whole—not just ALI. Appellants' App. Vol. 4 pp. 34–35. Seavey further testified unequivocally that the entities within the American Legion structure of organizations are "separate and distinct." *Id*. As to the argument that each level of the organization is doing the work of the American Legion, Seavey testified that this related to the "four pillars" upon which the American Legion was founded, "Children and Youth, Americanism, National Security, and Veterans Affairs." *Id*. at 41. Such evidence does not create a factual dispute as to whether the Legion Defendants disregarded the corporate form such that Post #354 should be considered an alter ego or mere instrumentality of the Legion Defendants.

[27] The Plaintiffs also argue that the corporate veil should be pierced, and the Legion Defendants held liable for the conduct of Post #354, because the Legion Defendants benefited from the operation of the bar at Post #354. However, the designated evidence reveals that the Legion Defendants did not receive any funds from the operation of the bar at Post #354. Instead, the only funds that ALI and the Indiana Branch receive from Post #354 are a portion of the membership dues for each member of the post. *Id*. at 65–66. And both ALA and ALA-Indiana only receive funds from the membership dues of the members of their local unit and not from the members of Post #354. Although the Plaintiffs designated evidence that, "[m]onthly, the Auxiliary would take a percentage of all food sales from Post #354," Appellant's App. Vol. 7 p. 3, the term Auxiliary is unclear as to which entity it refers, and the statement is not

sufficient to overcome the other evidence that ALA and ALA-Indiana did not profit from the operation of the bar at Post #354.

[28] The Plaintiffs' designated evidence fails to create a genuine issue of material fact to support a reasonable inference that the Legion Defendants exercise control over Post #354 to such a degree that Post #354 became a mere instrumentality of the Legion Defendants. Because we conclude that the Plaintiffs failed to designate evidence establishing a genuine issue of material fact regarding the level of control to consider Post #354 an alter ego or mere instrumentality of the Legion Defendants, we do not need to determine whether there was evidence of the perpetration of illegality or injustice by the perpetration of a fraud or wrong by the Legion Defendants through Post #354 because there was no misuse of the corporate form that resulted in any unjust loss or injury to the Plaintiffs. We, therefore, conclude that the designated evidence presented did not establish that there is a genuine issue of material fact supporting the piercing of the corporate veil regarding the Legion Defendants.

## Conclusion

[29] As the moving party, the Legion Defendants had the initial burden of making a prima facie showing that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law. The Legion Defendants have met their burden. The burden then shifted to the Plaintiffs to come forward with evidence establishing the existence of genuine issue of material fact, which they have failed to do, and as a result, the trial court's order granting summary judgment in favor of the Legion Defendants was proper. We, therefore,

conclude that the trial court did not err in granting summary judgment in favor of the Legion Defendants because there was no genuine issue of material fact as to whether they could be held vicariously liable for the conduct of Post #354 and no genuine issue of material fact supported the piercing of the corporate veil.

[30]     Affirmed.


Mathias, J. and Felix, J., concur.

ATTORNEYS FOR APPELLANTS

Brandon S. Danks
Rick A. Cory
Danks & Danks
Evansville, Indiana

ATTORNEY FOR APPELLEE THE AMERICAN LEGION—INDIANA BRANCH

Justin O. Sorrell
Riley Bennett Egloff, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE THE AMERICAN LEGION, INC.

Katherine M. Haire
Trenton W. Gill
Reminger Co., L.P.A.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE AMERICAN LEGION AUXILIARY

John J. Kreighbaum
Danny E. Glass
Fine & Hatfield, A Professional Corporation
Evansville, Indiana

ATTORNEY FOR APPELLEE AMERICAN LEGION AUXILIARY DEPARTMENT OF INDIANA

Kimberly E. Howard
Fisher Maas Howard Lloyd & Wheeler, P.C.
Indianapolis, Indiana